DAVID J. ROBER, as Administrator of the Estate of Alfred J.
Rober, Deceased, v. NORTHERN PACIFIC RAILWAY COM-
PANY, a Corporation.

(142 N. W. 22.)

**Wrongful act—railway company—ordinary care—contributory negligence—
question for jury—defendant—injury—proximate cause.**

Where, in a suit for death by wrongful act, it is claimed that the deceased
was run over by an engine of a railway company at a street crossing in an
incorporated city, and a portion of the body of the deceased was found in a
frog located from 4 to 6 feet from the planking in said crossing, and within
the limits of the highway; and the planking of said crossing did not extend,
as required by § 4321, Rev. Codes, 1905, across the full length of the said
highway, but only for about 16 feet; and there were no eyewitnesses to the
accident; and some of the evidence showed that on the night in question a
man could have been seen at a distance of 30 feet, and the outlines of a box
car at a distance of from 150 to 200 feet; and the engineer of the engine, which
it is claimed occasioned the loss of life, testified that he had switched past the
crossing a number of times during said night, but that when he crossed the
same he rang his bell, and that there were lights both in front and at the
rear of his said engine; but the evidence also showed that the night was very
cold and stormy; that a strong wind was blowing with a velocity of 30 to 45
miles an hour; that the thermometer registered 18 degrees below zero; that
dust and gravel and *débris* was flying, and the crossing was not lighted; and
that about an hour before the time at which the accident must have occurred
a hackman drove close to an engine on the track, which the evidence tended

Note.—The authorities on the presumption of care of person killed at railroad
crossing are discussed in notes in 16 L.R.A. 261; 4 L.R.A.(N.S.) 344; and 116
Am. St. Rep. 118. And upon the right to rely on presumption of self-preserva-
tion in action for negligent killing at railroad crossing in order to prevent non-
suit where there were no eyewitnesses to the killing, see note in 11 L.R.A.(N.S.)
844.

The question of the duty to maintain lookout for persons on track, generally,
is treated in notes in 25 L.R.A. 287, and 8 L.R.A.(N.S.) 1069. And as to the
liability for failure to give statutory signals when they would not have prevented
the injury, see note in 21 L.R.A. 723. And for failure to give customary signals
as excusing nonperformance of duty to look and listen, see note in 3 L.R.A.(N.S.)
391. See also note in 26 Am. Rep. 207.

The admissibility of mortality tables in evidence is the subject of notes in 40
L.R.A. 553, and 12 Am. St. Rep. 380.

to show was the one which ran over the deceased, without seeing same or hearing any bell or signal sounded; and the next morning blood was found upon the tender of a switch engine of the defendant, *held:* that the presumption of ordinary care which is based upon the instinct of self-preservation was not overcome as a matter of law, and that the question of contributory negligence was one for the jury, as well as the question as to whether there was negligence on the part of the defendant which was the proximate cause of the injury.

**Contributory negligence—burden of proof.**

2. The burden of proving contributory negligence is upon the defendant.

**Legal presumption—suicide.**

3. There is a legal presumption that one has not committed suicide.

**Crime—legal presumption.**

4. There is no legal presumption that a crime has been committed, or that under circumstances such as those in the case at bar, the deceased was murdered and his body thrown upon the track.

**Railway company—duty—crossings—lookout—travelers.**

5. It is the duty of a railway company to keep a proper lookout for travelers at a highway crossing which is within the limits of a city.

**Evidence—engineer—signals at crossings.**

6. In such a case evidence is admissible that an engineer who is charged with having failed to ring his bell and to give proper crossing signals at a particular time failed to do so at the same crossing, and on the same night, and within an hour of the alleged accident, and while engaged in the same general switching transaction.

**Death—mortality tables—substantial damages—expectancy—evidence—jury.**

7. In a suit brought under § 7686, Rev. Codes, 1905, for death by wrongful act, the introduction of mortality tables is not necessary to a recovery of substantial damages, either to show the expectancy of the life of the deceased or of his beneficiaries. At the common law, standard tables, and in North Dakota the Carlisle tables, are proper and competent evidence for the purpose of aiding the jury, but the introduction is not absolutely necessary.

**Verdict—evidence—damages.**

8. Evidence examined and *held,* to sustain the verdict both as to the question of negligence and the damages awarded.

Opinion filed May 23, 1913.

Appeal from the District Court for Morton County, Nuchols, J.

Action to recover damages for death by wrongful act. Verdict and judgment for plaintiff. Defendant appeals.

Judgment affirmed.

This action is brought by David J. Rober, the father of, and as the administrator of the estate of, Alfred J. Rober, deceased, for the killing of the said Alfred J. Rober on the night of the 31st day of December, 1909, at Mandan, North Dakota. The defendant made the usual motion for a directed verdict and a motion for a new trial. It, however, introduced no evidence in its behalf, and submitted no written instructions, and there were no exceptions to the charge. A verdict was rendered for $2,000 in favor of the plaintiff, and a judgment rendered thereon is here sought to be reversed.

The deceased was, at the time of his death, a young man of twenty-six years of age, of good health, and in the full possession of all of his faculties. There is no evidence whatever in the record that he was a drinking man, or that on the night in question he had used intoxicating liquors. He had been making his home with his father's family practically all of his life. There were seven children in all, three girls and four boys, of whom the oldest was twenty-eight years of age and the youngest fifteen. The youngest child was a girl of fifteen, and the next in age was a boy of about nineteen. These two, with a boy of about the age of twenty-one, a girl of about the age of twenty-four, and the deceased, of about the age of twenty-six, lived with their parents. The two older daughters were married and lived elsewhere. Alfred Rober, the deceased, lived at home. He had lived there practically all of his life. The earnings that he derived from time to time from his own efforts, and which for some time prior to his death were earned in working with his father in the concrete business, and were estimated at about $4 a day, were "practically all used as a family purse." His earnings and those of his father were all turned "into the family purse," "and were not divided." The father was fifty-three years of age. The age of the mother is not given, but the fact that the oldest child was at least twenty-eight years old would lead one to infer that she was at least forty-six years of age. There is no direct testimony as to the joint earnings of the father and son, though it is shown that the

father, during most of his lifetime, had been doing carpenter work and concrete work.

Deceased, on the night of December 31, 1909, and at about 11 o'clock, left his father's house to go to a dance at the opera house. The house was two and one-half blocks from the railroad crossing where the body of the deceased was found at about 12 o'clock,—between 12 and 2 o'clock. The night was stormy and cold. There was a wind of a velocity of from 30 to 40 miles an hour, though there was probably no snow flying. The thermometer registered 18 degrees below zero. There is some testimony that on the night in question one could tell a man 30 feet away, and make out the outline of a box car 150 to 200 feet distant. One witness, however, testified that he drove within a few feet of an engine about an hour prior to the accident, without seeing it or hearing the bell rung. The deceased approached the railway track which ran east and west, from the north. There was a clear view of the yards 100 feet south of the crossing. The wind was blowing from the northwest. There is evidence that a switch engine of the company ran up and down the track and across the crossing practically all night, and that this engine was seen between 10 and 11 o'clock, with no tail light on it; also, that between 10 and 11 o'clock this engine almost ran into a witness; that it had then no tail light, and that the witness heard no gong or bell sounded. This, however, was objected to as being prior to the supposed time of the accident. Blood was found upon a switch engine in the yards of the company on the following morning, though the particular switch engine was not identified as being the one last mentioned. There is evidence, however, that another engine and crew were also operating in the yards besides the one last mentioned, though whether it crossed the particular crossing was not testified to. There were no gates at the crossing, and there was no flagman. There were no lights except the switch lights. In the middle of the crossing, and between the rails, there were planks about 14 or 16 feet in length. There was, however, no sidewalk across the track. From 4 to 6 feet east of these planks was a frog with the V pointing to the west and towards the crossing, and which, though not on the planking, was within the roadway. At the east end of this frog, which covered 4 or 5 feet, were found clothes and parts of the body of the deceased, at about 1 o'clock in the morning. Between the frog and the crossing was a piece of leg and a piece of back bone. The

frog was full of clothes and parts of flesh. At the east end of the frog there was found a foot of the right leg with a shoe on it. Part of the body and the left leg were lying at the north side of the track between the frog and the planking. The left leg was west of the end of the plank. The other leg was east of the frog. Neither of the legs, however, were in the frog. The shoe belonging to the left foot was found removed from the foot, close to the main part of the body and right beside the frog, at the east end. Pieces of the body were scattered over a distance of about 100 feet west of the crossing. The leg on which the shoe was left was cut square off between the knee and the ankle. The defendant put no witnesses upon the stand, but the engineer of the switch engine mentioned was called by the plaintiff. He testified that he ran his engine across the crossing all that night, back and forth. He, however, testifies that he did not know that a man had been killed until about 1 o'clock in the morning, when he was coming back from supper. He said that he was told this fact by the engineer of the other switch engine at that time, who was evidently in the court room at the time of the trial, but was not called by the defendant. He said that the other switch engine was in the vicinity that night, though he did not know that it crossed the crossing. He said that he left his engine about 12 o'clock. He said that he had lights on both ends of his engine and rang his bell at the crossing. He testified, however, that he never, at any time during the night, saw a man on or near the crossing, and never knew that any man was injured or killed until between 12:30 and 1 o'clock, when he was told of the fact by others; nor did he discover that there was any blood or flesh near the frog until afterwards.

*Ball, Watson, Young, & Lawrence* and *E. T. Commy,* for appellant.
Physical facts, ordinarily the best evidence, should be sufficient to overcome the slight presumption raised by the instinct of self-preservation. Northern P. R. Co. v. Freeman, 174 U. S. 379–383, 43 L. ed. 1014–1016, 19 Sup. Ct. Rep. 763; Baltimore & O. R. Co. v. Landrigan, 191 U. S. 461, 48 L. ed. 262, 24 Sup. Ct. Rep. 137.

The presumption of the exercise of due care is at variance with the physical facts; these facts should overcome such presumption. Garlich v. Northern P. R. Co. 67 C. C. A. 237, 131 Fed. 837; Chicago & N. W. R. Co. v. Andrews, 64 C. C. A. 399, 130 Fed. 65; Chicago, St. P. M.

& O. R. Co. v. Rossow, 54 C. C. A. 313, 117 Fed. 491; Chicago, R. I. & P. R. Co. v. Pounds, 27 C. C. A. 112, 49 U. S. App. 476, 82 Fed. 217; Pyle v. Clark, 25 C. C. A. 190, 49 U. S. App. 260, 79 Fed. 744, 2 Am. Neg. Rep. 100; Tomlinson v. Chicago, M. & St. P. R. Co. 67 C. C. A. 218, 134 Fed. 234; Rich v. Chicago, M. & St. P. R. Co. 78 C. C. A. 663, 149 Fed. 80.

A person about to cross a railroad track must bear in mind the dangers, and use his senses of sight and hearing, to avoid injury. Hope v. Great Northern R. Co. 19 N. D. 438, 122 N. W. 997; Rollins v. Chicago, M. & St. P. R. Co. 71 C. C. A. 615, 139 Fed. 639; Payne v. Chicago & N. W. R. Co. 108 Iowa, 188, 78 N. W. 813; Wabash R. Co. v. De Tar, 4 L.R.A.(N.S.) 352, 73 C. C. A. 166, 141 Fed. 932; Rich v. Chicago, M. & St. P. R. Co. 78 C. C. A. 663, 149 Fed. 84; Baker v. Chicago, R. I. & P. R. Co. 95 Iowa, 163, 63 N. W. 667; Hanna v. Philadelphia & R. R. Co. 213 Pa. 157, 4 L.R.A.(N.S.) 346, 62 Atl. 643; Crawford v. Chicago, G. W. R. Co. 109 Iowa, 433, 80 N. W. 519; Schmidt v. Missouri P. R. Co. 191 Mo. 215, 3 L.R.A. (N.S.) 196, 90 S. W. 136; Lynch v. Metropolitan Street R. Co. 112 Mo. 433, 20 S. W. 642; Mathews, Presumptive Ev. 203; Dalton v. Chicago, R. I. & P. R. Co. 114 Iowa, 257, 86 N. W. 272; 33 Cyc. 922, 923, 1072–1074, 1117, 1118; Sims v. St. Louis & S. R. Co. 116 Mo. App. 572, 92 S. W. 909; Indiana, B. & W. R. Co. v. Hammock, 113 Ind. 1, 14 N. E. 737; Beach, Neg. ¶ 64, p. 738; Woolf v. Washington R. & Nav. Co. 37 Wash. 491, 79 Pac. 997; Herbert v. Southern P. Co. 121 Cal. 227, 53 Pac. 651; Cleveland, C. C. & St. L. R. Co. v. Miller, 149 Ind. 490, 49 N. E. 445.

It is presumed that one actually saw and heard what he could have seen and heard, if he had looked and listened before attempting to cross the track. Malott v. Hawkins, 159 Ind. 127, 63 N. E. 308; Dalton v. Chicago, R. I. & P. R. Co. 114 Iowa, 257, 86 N. W. 272; Kunkel v. Minneapolis, St. P. & S. Ste. M. R. Co. 18 N. D. 367, 121 N. W. 830.

The duty of the plaintiff in such a case is twofold. He must show due care, and that defendant's negligence was the direct and proximate cause of the injury.

The rule *res ipsa loquitur* does not apply where the injured person and the negligent person were both in the exercise of an equal right and were charged with the same degree of care. 29 Cyc. 590–592;

33 Cyc. 922, 923, 1066–1068; Holbrook v. Utica & S. R. Co. 12 N. Y. 236, 64 Am. Dec. 232; Cosulich v. Standard Oil Co. 122 N. Y. 118, 19 Am. St. Rep. 475, 25 N. E. 259; Dobbins v. Brown, 119 N. Y. 188, 23 N. E. 537; DeVau v. Pennsylvania & N. Y. Canal & R. Co. 130 N. Y. 632, 28 N. E. 532; Western v. Troy, 139 N. Y. 281, 34 N. E. 780; Le Barron v. East Boston Ferry Co. 11 Allen, 312, 87 Am. Dec. 717, 3 Am. Neg. Cas. 760; Kendall v. Boston, 118 Mass. 234, 19 Am. Rep. 446; Thomas, Neg. 574, 576, 582; Gahagan v. Boston & M. R. Co. 70 N. H. 441, 55 L.R.A. 426, 50 Atl. 146.

No recovery can be had where the circumstances of the accident are not sufficiently disclosed to warrant any inference upon the question of care or negligence.	Crafts v. Boston, 109 Mass. 519.

The evidence must show how the accident occurred, and what the injured party was doing, at the time.	Corcoran v. Boston & A. R. Co. 133 Mass. 507; Riley v. Connecticut River R. Co. 135 Mass. 292; McGrath v. St. Louis Transit Co. 197 Mo. 97, 94 S. W. 872; Benedick v. Potts, 88 Md. 52, 41 L.R.A. 478, 40 Atl. 1067, 4 Am. Neg. Rep. 484; Cothron v. Cudahy Packing Co. 98 Mo. App. 349, 73 S. W. 279; Hamilton v. Metropolitan Street R. Co. 114 Mo. App. 509, 89 S. W. 893; Ely v. St. Louis, K. C. & N. R. Co. 77 Mo. 34; Leslie v. Wabash, St. L. & P. R. Co. 88 Mo. 50, 4 Am. Neg. Cas. 569; Yarnell v. Kansas City, Ft. S. & M. R. Co. 113 Mo. 570, 18 L.R.A. 599, 21 S. W. 1, 4 Am. Neg. Cas. 714; Bunyon v. Citizens' R. Co. 127 Mo. 19, 29 S. W. 842; Hite v. Metropolitan Street R. Co. 130 Mo. 136, 51 Am. St. Rep. 555, 31 S. W. 262, 32 S. W. 33; McManamee v. Missouri P. R. Co. 135 Mo. 447, 37 S. W. 119; Bartley v. Metropolitan Street R. Co. 148 Mo. 139, 49 S. W. 840, 5 Am. Neg. Rep. 635; Gayle v. Missouri Car & Foundry Co. 177 Mo. 450, 76 S. W. 987; Breeden v. Big Circle Min. Co. 103 Mo. App. 179, 76 S. W. 731.

There can be no recovery in damages for remote possibilities or conjectural losses.	Watson, Damages for Personal Injuries, pp. 365–367; McLane v. Perkins, 92 Me. 39, 43 L.R.A. 487, 42 Atl. 255; Caven v. Troy, 32 App. Div. 154, 52 N. Y. Supp. 804; 29 Cyc. 597–600, 623, 624, 629; Jenkins v. St. Paul City R. Co. 105 Minn. 504, 20 L.R.A. (N.S.) 401, 117 N. W. 928; Philadelphia & R. R. Co. v. Schertle, 97 Pa. 454; Douglass v. Mitchell, 35 Pa. 443; Philadelphia & R. R.

Co. v. Heil, 5 W. N. C. 91; Omaha & R. Valley R. Co. v. Talbot, 48 Neb. 627, 67 N. W. 599; Welsh v. Erie & W. Valley R. Co. 181 Pa. 461, 37 Atl. 513, 2 Am. Neg. Rep. 777.

The lone fact that a person who was walking is found dead beneath a railroad engine at a grade crossing raises no presumption that those operating the engine were negligent, but negligence must be proved. St. Louis & S. F. R. Co. v. Chapman, 71 C. C. A. 523, 140 Fed. 129; Davis v. Quincy, O. & K. C. R. Co. 155 Mo. App. 312, 136 S. W. 718; Kilpatrick v. Richardson, 37 Neb. 731, 56 N. W. 481; Newhard v. Pennsylvania R. Co. 153 Pa. 417, 19 L.R.A. 563, 26 Atl. 105; Wright v. Boston & M. R. Co. 74 N. H. 128, 8 L.R.A.(N.S.) 832, 65 Atl. 687; 33 Cyc. 1061–1064, 1128, 1129; Thomas, Neg. 582; Strock v. Louisville & N. R. Co. 145 Ky. 150, 140 S. W. 40; Early v. Louisville, H. & St. L. R. Co. 115 Ky. 13, 72 S. W. 348; Louisville, St. L. & T. R. Co. v. Terry, 20 Ky. L. Rep. 803, 47 S. W. 588; Louisville & N. R. Co. v. Humphrey, 20 Ky. L. Rep. 642, 45 S. W. 503; Louisville & N. R. Co. v. Wathen, 22 Ky. L. Rep. 82, 49 S. W. 185; S. F. Dana & Co. v. Blackburn, 121 Ky. 707, 90 S. W. 237; Cameron v. Great Northern R. Co. 8 N. D. 125, 77 N. W. 1016, 5 Am. Neg. Rep. 454; Scherer v. Schlaberg, 18 N. D. 421, 24 L.R.A.(N.S.) 520, 122 N. W. 1000; Umsted v. Colgate Farmers Elevator Co. 18 N. D. 309, 122 N. W. 390.

Other independent acts of negligence on the part of the railroad company are clearly collateral and irrelevant matters. Northern P. R. Co. v. Heaton, 111 C. C. A. 548, 191 Fed. 24; Baker v. Irish, 172 Pa. 528, 33 Atl. 558; Gillrie v. Lockport, 122 N. Y. 403, 25 N. E. 357; Thomas, Neg. p. 587; Thompson v. Bowle, 4 Wall. 463, 18 L. ed. 423; Carr v. West End Street R. Co. 163 Mass. 360, 40 N. E. 185; Eppendorf v. Brooklyn City & N. R. Co. 69 N. Y. 195, 25 Am. Rep. 171, 5 Am. Neg. Cas. 219; Langworthy v. Green Twp. 88 Mich. 207, 50 N. W. 130; Hudson v. Chicago & N. W. R. Co. 59 Iowa, 581, 44 Am. Rep. 692, 13 N. W. 735; 1 Greenl. Ev. 52; Kennedy v. Spring, 160 Mass. 203, 35 N. E. 779; Greeno v. Roark, 8 Kan. App. 390, 56 Pac. 329; Dalton v. Chicago, R. I. & P. R. Co. 114 Iowa, 257, 86 N. W. 273; Hutcherson v. Louisville & N. R. Co. 21 Ky. L. Rep. 733, 52 S. W. 956; Missouri, K. & T. R. Co. v. Texas, 35 Tex. Civ. App. 604, 81 S. W. 589; McGovern v. Smith, 73 Vt. 52, 50 Atl. 549; Clark v.

25 N. D.—26.

Smith, 72 Vt. 138, 47 Atl. 391; Southern R. Co. v. Winchester, 127 Ky. 144, 105 S. W. 167.

Whether or not a signal was given by the approach of a train to a station or crossing on a certain occasion, cannot be shown or proven by the conduct of those in charge of some other train, or some other occasion. Eskridge v. Cincinnati, N. O. & T. P. R. Co. 89 Ky. 367, 12 S. W. 581; Findley Brewing Co. v. Bauer, 50 Ohio St. 560, 35 N. E. 55.

Verdict cannot be based upon speculation or conjecture. Satterberg v. Minneapolis, St. P. & S. Ste. M. R. Co. 19 N. D. 38, 121 N. W. 70; Rev. Codes 1905, §§ 7686–7691; Louisville, N. A. & C. R. Co. v. Goodykoontz, 119 Ind. 111, 12 Am. St. Rep. 371, 21 N. E. 472.

In computing damages for wrongful death, only pecuniary loss to beneficiaries can be considered. Brady v. Chicago, 4 Biss. 448, Fed. Cas. No. 1,796; Hollyday v. Reeves, 5 Hughes, 89, Fed. Cas. No. 6,625; Conant v. Griffin, 48 Ill. 410; Illinois C. R. Co. v. Baches, 55 Ill. 379; Lake Shore & M. S. R. Co. v. Sunderland, 2 Ill. App. 307; Lake Shore & M. S. R. Co. v. Ouska, 51 Ill. App. 334; Armour v. Czischki, 59 Ill. App. 17; Gunderson v. Northwestern Elevator Co. 47 Minn. 161, 49 N. W. 694; Schaub v. Hannibal & St. J. R. Co. 106 Mo. 74, 16 S. W. 924; Wise v. Peerpenning, 2 Edm. Sel. Cas. 112; Oldfield v. New York & H. R. Co. 14 N. Y. 310; Lehman v. Brooklyn, 29 Barb. 234; Mitchell v. New York C. & H. R. R. Co. 2 Hun, 535; Hall v. Crain, 2 Ohio Dec. Reprint, 453, 3 Ohio L. J. 137; Pennsylvania R. Co. v. Vandever, 36 Pa. 298; Caldwell v. Brown, 53 Pa. 453; March v. Walker, 48 Tex. 372; McGown v. International & G. N. R. Co. 85 Tex. 289, 20 S. W. 80; Galveston, H. & S. A. R. Co. v. Worthy, 87 Tex. 459, 29 S. W. 376; Gulf, C. & S. F. R. Co. v. Southwick, — Tex. Civ. App. —, 30 S. W. 592; Potter v. Chicago & N. W. R. Co. 21 Wis. 377, 94 Am. Dec. 548, 7 Am. Neg. Cas. 157; Richmond v. Chicago & W. M. R. Co. 87 Mich. 374, 49 N. W. 621; Duval v. Hunt, 34 Fla. 85, 15 So. 876, 13 Am. Neg. Cas. 848; Illinois C. R. Co. v. Crudupt, 63 Miss. 291; Baltimore & O. R. Co. v. State, 33 Md. 542; Baltimore & O. R. Co. v. State, 41 Md. 268; Cumberland & P. R. Co. v. State, 45 Md. 234; Philadelphia, W. & B. R. Co. v. State, 58 Md. 372; Baltimore & R. Turnp. Road v. State, 71 Md. 573, 18 Atl. 887; Galveston v. Barbour, 62 Tex. 174, 50 Am. Rep. 519; Inter-

national & G. N. R. Co. v. Ormond, 64 Tex. 490; Houston & T. C. R.
Co. v. Cowser, 57 Tex. 293; Houston & T. C. R. Co. v. Nixon, 52
Tex. 19; Rev. Stat. art. 2909; Missouri P. R. Co. v. Lee, 70 Tex.
496, 7 S. W. 860; Swift v. Gaylord, 229 Ill. 330, 82 N. E. 300.

The burden is upon the plaintiff to give some clear, definite data
upon which damages can be estimated. James v. Florida C. & P. R.
Co. 115 Ga. 313, 41 S. W. 585; Potter v. Chicago & N. W. R. Co.
21 Wis. 373, 94 Am. Dec. 549, 7 Am. Neg. Cas. 157; Tilley v. Hud-
son River R. Co. 29 N. Y. 252, 86 Am. Dec. 297; Chicago, R. I. &
P. R. Co. v. Hambel, 2 Neb. (Unof.) 607, 89 N. W. 643; Chicago,
St. P. M. & O. R. Co. v. Lagerkrans, 65 Neb. 566, 91 N. W. 358, 95
N. W. 2, distinguished; Crabtree v. Missouri P. R. Co. 86 Neb. 33,
136 Am. St. Rep. 663, 124 N. W. 932; Valente v. Sierra R. Co. 151
Cal. 534, 91 Pac. 481; Rhoads v. Chicago & A. R. Co. 227 Ill. 328,
11 L.R.A.(N.S.) 623, 81 N. E. 371, 10 Ann. Cas. 113; Pierce, Rail-
roads, 393–399, and cases cited; Franklin v. Southeastern R. Co. 3
Hurlst. & N. 211, 4 Jur. N. S. 565, 6 Week. Rep. 573; Dalton v.
Southeastern R. Co. 4 C. B. N. S. 296, 4 Jur. N. S. 711, 27 L. J.
C. P. N. S. 227, 6 Week. Rep. 574; Pennsylvania R. Co. v. Books, 57
Pa. 339, 98 Am. Dec. 229; Little Rock & Ft. S. R. Co. v. Townsend,
41 Ark. 382; Fordyce v. McCants, 51 Ark. 509, 4 L.R.A. 296, 14 Am.
St. Rep. 69, 11 S. W. 695; Galveston, H. & S. A. R. Co. v. Davis,
4 Tex. Civ. App. 468, 23 S. W. 301; Richmond v. Chicago & W. M.
R. Co. 87 Mich. 374, 49 N. W. 621; Toledo, W. & W. R. Co. v. As-
bury, 84 Ill. 429; Hall v. Galveston, H. & S. A. R. Co. 39
Fed. 18; Illinois C. R. Co. v. Baches, 55 Ill. 379; Missouri P. R.
Co. v. Lee, 70 Tex. 496, 7 S. W. 857; Staal v. Midland R. Co. 57
Mich. 239, 23 N. W. 795; Blake v. Midland R. Co. 18 Q. B. 93, 21
L. J. Q. B. N. S. 233, 16 Jur. N. S. 562; Duval v. Hunt, 34 Fla. 85,
15 So. 885, 13 Am. Neg. Cas. 848; Baltimore & R. Turnp. Road v.
State, 71 Md. 573, 18 Atl. 884; Baltimore & O. R. Co. v. State, 33
Md. 542, 41 Md. 268; Barron v. Northern P. R. Co. 16 N. D. 277,
113 N. W. 102; Sedgw. Damages, 180, 483; Smith v. Evans, 13 Neb.
314, 14 N. W. 406; Esterly Harvesting Mach. Co. v. Frolkey, 34 Neb.
110, 51 N. W. 594; Galveston, H. & S. A. R. Co. v. Thornsberry,
— Tex. —, 17 S. W. 521, 6 Am. Neg. Cas. 610, 5 Am. & Eng. Enc.
Law, 718; Scherer v. Schalberg, 18 N. D. 421, 24 L.R.A.(N.S.) 520,

122 N. W. 1000; Spicer v. Northern P. R. Co. 21 N. D. 61, 128 N. W. 302.

*Melvin A. Hildreth,* for respondent.

Errors not discussed, and to which the attention of the court is not directly called in appellant's brief, are abandoned. Flora v. Mathwig, 19 N. D. 5, 121 N. W. 63.

The denying of the motion for a new trial or for judgment notwithstanding the verdict is not assigned as error in the record, and this court ought not to review the case. State v. Wright, 20 N. D. 216, 126 N. W. 1023, Ann. Cas. 1912 C, 795; Rule 14, 10 N. D. XLVI, 91 N. W. VIII; Acton v. Fargo & M. Street R. Co. 20 N. D. 434, 129 N. W. 225; Sucker State Drill Co. v. Brock, 18 N. D. 532, 123 N. W. 667.

The case was properly submitted to the jury, and by the verdict, every fact and inference has been settled in favor of the plaintiff. The negligence of the defendant, as the proximate cause of the injury, is fully established. Anderson v. Minneapolis, St. P. & S. Ste. M. R. Co. 18 N. D. 463, 123 N. W. 281; Union Stock-Yards v. Conoyer, 41 Neb. 617, 59 N. W. 950; Phillips v. Milwaukee & N. R. Co. 77 Wis. 349, 9 L.R.A. 521, 46 N. W. 543; Kern v. Snider, 76 C. C. A. 201, 145 Fed. 327; Weiler v. Manhattan R. Co. 53 Hun, 372, 6 N. Y. Supp. 320, 5 Am. Neg. Cas. 472, affirmed in 127 N. Y. 669, 28 N. E. 255; Adams v. Bunker Hill & S. Min. Co. 12 Idaho, 637, 11 L.R.A.(N.S.) 846, 89 Pac. 624; Solberg v. Schlosser, 20 N. D. 315, 30 L.R.A.(N.S.) 1111, 127 N. W. 91; Northern P. R. Co. v. Everett, 152 U. S. 107, 38 L. ed. 373, 14 Sup. Ct. Rep. 474; Daily v. New York, N. H. & H. R. R. Co. 167 Fed. 600; Hall v. Northern P. R. Co. 16 N. D. 60, 111 N. W. 609, 14 Ann. Cas. 960; Higgs v. Minneapolis, St. P. & S. Ste. M. R. Co. 16 N. D. 447, 15 L.R.A.(N.S.) 1162, 114 N. W. 722, 15 Ann. Cas. 97; Henavie v. New York C. & H. R. R. Co. 166 N. Y. 280, 59 N. E. 901, 9 Am. Neg. Rep. 345; Dyer v. Erie R. Co. 71 N. Y. 228, 12 Am. Neg. Cas. 347; Houghkirk v. Delaware & H. Canal Co. 92 N. Y. 219, 44 Am. Rep. 370; Thompson v. New York C. & H. R. R. Co. 110 N. Y. 636, 17 N. E. 690; Vandewater v. New York & N. E. R. Co. 135 N. Y. 583, 18 L.R.A. 771, 32 N. E. 636.

Where the evidence of negligence is in doubt, or where different

minds might draw different conclusions from all of the testimony, the case is one for the jury. McNamara v. New York C. & H. R. R. Co. 136 N. Y. 650, 32 N. E. 765; Wilson v. Southern P. R. Co. 62 Cal. 164; Painton v. Northern C. R. Co. 83 N. Y. 8; 2 Thomp. Neg. §§ 1697, 1699, 1700; Patterson, R. Acci. Law, p. 156, and cases cited in foot notes. See pages 166, 167; Kunkel v. Minneapolis, St. P. & S. Ste. M. R. Co. 18 N. D. 377, 121 N. W. 830.

Where a party can offer proof of facts which would rebut the inferences which are already established, and fails to do so, the natural inference is that such proof, instead of rebutting, would be supporting the inferences against him. Pennsylvania R. Co. v. Anoka Nat. Bank, 47 C. C. A. 454, 108 Fed. 482; Union Trust Co. v. McClellan, 40 W. Va. 405, 21 S. E. 1025; 1 Moore, Facts, §§ 556–564.

It is to be presumed that plaintiff, on the night in question, was exercising ordinary care and diligence for his own protection. Kunkel v. Minneapolis, St. P. & S. Ste. M. R. Co. 18 N. D. 380, 121 N. W. 830; Chicago, M. & St. P. R. Co. v. Donovan, 87 C. C. A. 600, 160 Fed. 826; Kern v. Snider, 145 Fed. 328, 76 C. C. A. 201; Missouri, K. & T. R. Co. v. Byrne, 40 C. C. A. 402, 100 Fed. 362; Big Bushy Coal & Coke Co. v. Williams, 99 C. C. A. 102, 176 Fed. 529; Chicago & N. W. R. Co. v. Netolicky, 14 C. C. A. 615, 32 U. S. App. 168, 406, 67 Fed. 668; Shaber v. St. Paul, M. & M. R. Co. 28 Minn. 103, 9 N. W. 578; Bolinger v. St. Paul & D. R. Co. 36 Minn. 418, 1 Am. St. Rep. 680, 31 N. W. 856; Loucks v. Chicago, M. & St. P. R. Co. 31 Minn. 526, 18 N. W. 651; Grant v. Oregon R. & Nav. Co. 54 Wash. 678, 25 L.R.A.(N.S.) 925, 103 Pac. 1126; Delaware, L. & W. R. Co. v. Converse, 139 U. S. 469, 35 L. ed. 213, 11 Sup. Ct. Rep. 569; Watertown v. Greaves, 56 L.R.A. 865, 50 C. C. A. 172, 112 Fed. 183; McGhee v. Campbell, 42 C. C. A. 94, 101 Fed. 936; St. Louis, I. M. & S. R. Co. v. Leftwich, 54 C. C. A. 1, 117 Fed. 127, 12 Am. Neg. Rep. 395; Hemingway v. Illinois C. R. Co. 52 C. C. A. 477, 114 Fed. 843; Texas & P. R. Co. v. Carlin, 60 L.R.A. 462, 49 C. C. A. 605, 111 Fed. 777; Patterson, Railway Acci. Law, 166, 167; Gray v. Chicago, R. I. & P. R. Co. 143 Iowa, 268, 121 N. W. 1099; Liabraaten v. Minneapolis, St. P. & S. Ste. M. R. Co. 105 Minn. 207, 117 N. W. 423; Mason v. Lansing & J. R. Co. 157 Mich. 1, 129 N. W. 468; Bruggeman v. Illinois C. R. Co. 147 Iowa, 187, 123 N. W. 1007;

Stotelmeyer v. Chicago, M. & St. P. R. Co. 148 Iowa, 278, 127 N. W. 205; Stewart v. Hall, 150 Iowa, 744, 130 N. W. 994; Nilson v. Chicago, B. & Q. R. Co. 84 Neb. 595, 121 N. W. 1128; Kafka v. Union Stock-Yards Co. 87 Neb. 331, 127 N. W. 129; Solberg v. Schlosser, 20 N. D. 307, 30 L.R.A.(N.S.) 1111, 127 N. W. 91; Whaley v. Vidal, 27 S. D. 627, 132 N. W. 245; Tietz v. Grand Trunk R. Co. 166 Mich. 205, 131 N. W. 710; Klotz v. Winona & St. P. R. Co. 68 Minn. 341, 71 N. W. 257; Cooper v. Lake Shore & M. S. R. Co. 66 Mich. 261, 33 N. W. 306; McKenna v. Baessler, 86 Iowa, 197, 17 L.R.A. 310, 53 N. W. 104; 2 Thomp. Neg. § 1506, p. 183; see 6 Thomp. Neg. § 7390, p. 430; Great Northern R. Co. v. McLaughlin, 17 C. C. A. 330, 44 U. S. App. 189, 70 Fed. 669; Dwyer v. St. Louis & S. F. R. Co. 52 Fed. 88; Haugen v. Chicago, M. & St. P. R. Co. 3 S. D. 394, 53 N. W. 769; Richardson v. Boston, 19 How. 263, 15 L. ed. 639; Frisbie v. Whitney, 9 Wall. 196, 19 L. ed. 672; Cork v. Blossom, 162 Mass. 330, 38 N. E. 476; Lehnertz v. Minneapolis & St. L. R. Co. 31 Minn. 219, 17 N. W. 376; Madden v. Minneapolis & St. L. R. Co. 30 Minn. 453, 16 N. W. 263; Chicago & A. R. Co. v. Adler, 56 Ill. 344; Ohio & M. R. Co. v. People, 45 Ill. App. 583; 5 Enc. Pl. & Pr. 691–693.

Where a party objects to testimony, he must at all times maintain a hostile attitude towards such testimony. See Abbott, Civil Jury Trials, 3d ed. 323; Missouri P. R. Co. v. Bentley, 78 Kan. 221, 93 Pac. 150, 96 Pac. 800; Miller v. Miller, 92 Va. 510, 23 S. E. 891; Jenkins v. Salmon Brick & Lumber Co. 120 La. 549, 45 So. 435; Virginia & T. Coal & I. Co. v. Fields, 94 Va. 102, 26 S. E. 426; New York L. Ins. Co. v. Taliaferro, 95 Va. 522, 28 S. E. 879; Southern R. Co. v. Hansbrough, 107 Va. 733, 60 S. E. 58; Tacoma Light & Water Co. v. Huson, 13 Wash. 124, 42 Pac. 536; Wees v. Page, 47 Wash. 213, 91 Pac. 766; King v. Haney, 46 Cal. 561, 13 Am. Rep. 217.

Present negligence cannot be predicated upon proof of prior acts of negligence. But where the testimony tends to show circumstances similar as to time and place, and as to conduct and conditions, it is competent, and is not collateral. Chicago & A. R. Co. v. Adler, 56 Ill. 344; Ohio & M. R. Co. v. People, 45 Ill. App. 583; 5 Enc. Pl. & Pr. 691–693; Northern P. R. Co. v. Patterson, 154 U. S. 134, 38 L. ed. 936, 14 Sup. Ct. Rep. 977; Gulf, C. & S. F. R. Co. v. Johnson,

4 C. C. A. 447, 10 U. S. App. 629, 54 Fed. 474; Berry v. Seawell, 13 C. C. A. 101, 31 U. S. App. 41, 65 Fed. 742; Field v. New York C. R. Co. 32 N. Y. 339; Quinlin v. Utica, 11 Hun, 217, 74 N. Y. 603; Chicago v. Powers, 42 Ill. 169, 89 Am. Dec. 418; Rich v. Chicago, M. & St. P. R. Co. 78 C. C. A. 663, 149 Fed. 79; Northern P. R. Co. v. Lewis, 2 C. C. A. 446, 7 U. S. App. 254, 51 Fed. 658; Grand Trunk R. Co. v. Richardson, 91 U. S. 469, 23 L. ed. 362; Ohio & M. R. Co. v. People, 45 Ill. App. 583; 5 Enc. Pl. & Pr. 691, and cases cited; Kent v. Lincoln, 32 Vt. 591; Kelly v. Southern Minnesota R. Co. 28 Minn. 98, 9 N. W. 588; Heinmiller v. Winston Bros. 131 Iowa, 32, 6 L.R.A.(N.S.) 150, 117 Am. St. Rep. 405, 107 N. W. 1102; Sheldon v. Hudson River R. Co. 14 N. Y. 218, 67 Am. Dec. 155; Payne v. Troy & B. R. Co. 83 N. Y. 572; Wolfkiel v. 6th Ave. R. Co. 38 N. Y. 49, 5 Am. Neg. Cas. 106; Webber v. New York C. & H. R. R. Co. 58 N. Y. 451; Hart v. Hudson River Bridge Co. 80 N. Y. 622; 1 Wigmore, Ev. p. 18, subdiv. D; Gale v. Schillock, 4 Dak. 182, 29 N. W. 661; Hayden v. Palmer, 2 Hill, 205; Robers v. Chicago & N. W. R. Co. 35 Wis. 684; Gillett, Indirect & Collateral Ev. pp. 86–88, and cases in foot notes; McCarragher v. Rogers, 120 N. Y. 532, 34 N. E. 812; District of Columbia v. Armes, 107 U. S. 519, 27 L. ed. 618, 2 Sup. Ct. Rep. 840; Indianapolis & St. L. R. Co. v. Stout, 53 Ind. 143; Judson v. New York & N. H. R. Co. 29 Conn. 434; Maltby v. Chicago & W. M. R. Co. 52 Mich. 108, 17 N. W. 717; Brown v. Chicago & N. W. R. Co. 102 Wis. 137, 44 L.R.A. 579, 77 N. W. 748, 78 N. W. 771; Louisville, N. A. & C. R. Co. v. Smith, 91 Ind. 119; Pittsburg, Ft. W. & C. R. Co. v. Dunn, 56 Pa. 280; Baughman v. Shenango & A. N. R. Co. 92 Pa. 335, 37 Am. Rep. 690; Mann v. Central Vermont R. Co. 55 Vt. 484, 45 Am. Rep. 628; O'Connor v. Boston & L. R. Corp. 135 Mass. 352; Pennsylvania R. Co. v. Boylan, 104 Ill. 595; Wasmer v. Delaware, L. & W. R. Co. 80 N. Y. 212, 36 Am. Rep. 608; Oliver v. Northeastern R. Co. L. R. 9 Q. B. 409, 43 L. J. Q. B. N. S. 198; Milwaukee & C. N. R. Co. v. Hunter, 11 Wis. 160, 78 Am. Dec. 699; Johnson v. St. Paul & D. R. Co. 31 Minn. 283, 17 N. W. 622; Pittsburgh Southern R. Co. v. Taylor, 104 Pa. 306, 49 Am. Rep. 580; Paine v. Grand Trunk R. Co. 58 N. H. 611.

There is abundant evidence of the negligence of the defendant, and that such negligence was the proximate cause of the death of Rober.

Worth Bros. v. Kallas, 89 C. C. A. 186, 162 Fed. 308; 2 Thomp. Neg. §§ 1695–1697; Milton v. Bangor R. & Electric Co. 103 Me. 218, 15 L.R.A.(N.S.) 203, 125 Am. St. Rep. 293, 68 Atl. 826; See Code Civ. Proc. § 4295; Gray v. Chicago, R. I. & P. R. Co. 143 Iowa, 268, 121 N. W. 1099; Korab v. Chicago, R. I. & P. R. Co. 149 Iowa, 711, 41 L.R.A.(N.S.) 32, 128 N. W. 531; Liabraaten v. Minneapolis, St. P. & S. Ste. M. R. Co. 105 Minn. 207, 117 N. W. 423; Merrill v. Minneapolis & St. L. R. Co. 27 S. D. 1, 129 N. W. 468; Bruggeman v. Illinois C. R. Co. 147 Iowa, 187, 123 N. W. 1007; Stotelmeyer v. Chicago, M. & St. P. R. Co. 148 Iowa, 278, 127 N. W. 205; Knudson v. Great Northern R. Co. 114 Minn. 244, 130 N. W. 994; Nilson v. Chicago, B. & Q. R. Co. 84 Neb. 595, 121 N. W. 1128; Kafka v. Union Stock-Yards Co. 87 Neb. 331, 127 N. W. 129; Solberg v. Schlosser, 20 N. D. 307, 30 L.R.A.(N.S.) 1111, 127 N. W. 91; Whaley v. Vidal, 27 S. D. 627, 132 N. W. 245; Tuetz v. Grand Trunk R. Co. 166 Mich. 205, 131 N. W. 710; Klotz v. Winona & St. P. R. Co. 68 Minn. 341, 71 N. W. 257, 3 Am. Neg. Rep. 201; Cooper v. Lake Shore & M. S. R. Co. 66 Mich. 261, 11 Am. St. Rep. 482, 33 N. W. 306; McKenna v. Baessler, 86 Iowa, 197, 17 L.R.A. 310, 53 N. W. 104; 2 Thomp. Neg. § 1506; Great Northern R. Co. v. McLaughlin, 17 C. C. A. 330, 44 U. S. App. 189, 70 Fed. 669; Dwyer v. St. Louis & S. F. R. Co. 52 Fed. 88; Haugen v. Chicago, M. & St. P. R. Co. 3 S. D. 394, 53 N. W. 769; Richardson v. Boston, 19 How. 263, 15 L. ed. 639; Frisbie v. Whitney, 9 Wall. 196, 19 L. ed. 672.

The evidence is ample to show the expectancy or value of the life of deceased to those entitled to benefits. Ruehl v. Lidgerwood Rural Teleph. Co. 23 N. D. 6, 133 N. W. 793; State v. Waholz, 28 Minn. 114, 9 N. W. 578; Satterberg v. Minneapolis, St. P. & S. Ste. M. R. Co. 19 N. D. 39, 121 N. W. 70; Tiffany, Death by Wrongful Act, 224–226.

Where no prejudicial error exists, and where the questions of fact have been properly submitted to the jury, and a verdict rendered, and a motion for a new trial heard before the trial court and denied, the order of the trial court should not be disturbed. MacGregor v. Pierce, 17 S. D. 51, 95 N. W. 281; Herrimen v. Menzies, 115 Cal. 16, 35 L.R.A. 318, 56 Am. St. Rep. 81, 44 Pac. 660, 46 Pac. 730; Cooney v. Furlong, 66 Cal. 520, 6 Pac. 388; Packer v. Doray, 98 Cal. 315, 33 Pac. 118.

BRUCE, J. (after stating the facts as above). Appellant relies upon four propositions for a reversal of this judgment: (1) That there was no proof of negligence on the part of the defendant; (2) that there is proof of contributory negligence; (3) that the proof offered does not in any way justify the awarding of anything but nominal damages; (4) that the evidence in relation to the switch engine which was seen by the hackman at about 10 o'clock and probably an hour prior to the accident was improperly admitted.

On the first two objections it is argued that there is evidence which tends to show that a man could have been seen on the night in question at a distance of 30 feet, and that the outlines of a box car could have been seen from 150 to 200 feet. The proof, however, also shows that the night was very cold and stormy, and that a strong wind was blowing with a velocity of from 30 to 45 miles an hour, and that dust and gravel and *débris* were in the air; the thermometer registered 18 degrees below zero; the yards were not lighted. There is also evidence that at about 10 o'clock a hackman drove close to an engine upon the track, which the evidence strongly tends to show was the one which ran over the deceased, without even seeing the same or hearing any bell or signal sounded. There is also evidence that blood was found upon the wheels and tender of a switch engine of the defendant the next morning. On the other hand, the engineer testified that there were lights on both ends of his engine, and that he sounded his bell whenever he passed the crossing. We do not believe that this evidence overcomes the presumption of ordinary care which is based upon the instinct of self-preservation. Kunkel v. Minneapolis, St. P. & S. Ste. M. R. Co. 18 N. D. 367, 121 N. W. 830, and cases there cited, 1 Moore, Facts, §§ 554, 555; Hanlon v. Milwaukee Electric R. & Light Co. 118 Wis. 210, 95 N. W. 100. It is true that this presumption does not overcome direct, probative evidence, but as we view the case, there is nothing in the record which rises to the dignity of such.

The plaintiff's intestate was killed on the crossing of a public highway, and within the limits of the city. There is no real dispute upon this question. The mangled remains of the body, and the clothes found in the frog in the highway, is sufficient evidence of this. The presumption of the law is that a man has not committed suicide, and therefore that the deceased did not voluntarily throw himself upon the track.

Soules v. Brotherhood of American Yeomen, 19 N. D. 23, 120 N. W. 760; Schraeder v. Modern Brotherhood, 90 Neb. 688, 39 L.R.A.(N.S.) 157, 134 N. W. 266; Walden v. Bankers' Life Asso. 89 Neb. 546, 131 N. W. 962; 1 Moore, Facts, § 651. So, too, there is no presumption that anyone else committed a crime, that is to say, killed him and placed his body upon the track. There is a presumption of due care on his part arising out of the instinct of self-preservation. Kunkel v. Minneapolis, St. P. & S. Ste. M. R. Co. supra; Cameron v. Great Northern R. Co. 8 N. D. 134, 77 N. W. 1016, 5 Am. Neg. Rep. 454. There is also, and above all, a duty on the part of the railway company to keep a proper lookout at a highway crossing, especially within the limits of cities. Coulter v. Great Northern R. Co. 5 N. D. 568, 67 N. W. 1046; Bishop v. Chicago, M. & St. P. R. Co. 4 N. D. 536, 62 N. W. 605; St. Louis Southwestern R. Co. v. Dingman, 62 Ark. 245, 35 S. W. 219. The engineer of the switch engine, which, as we view the evidence, must have occasioned the death of the deceased, or which, at any rate, was running up and down the track all night long and repeatedly crossed the crossing in question at and about the time when the accident must have occurred, testified that he knew nothing about the facts of the case at all, and did not know that the deceased had been run over until informed by someone else, some hour or so after the accident. The case, in our mind, was one for the jury to pass upon (Kunkel v. Minneapolis, St. P. & S. Ste. M. R. Co. supra; Anderson v. Minneapolis, St. P. & S. Ste. M. R. Co. 18 N. D. 463, 123 N. W. 281; St. Louis Southwestern R. Co. v. Dingman, 62 Ark. 245, 35 S. W. 219). If the accident had taken place between highway crossings, and upon the open prairie, where there was no absolute duty to ring a bell or to keep a proper lookout, and where the deceased would probably have been a trespasser, the case might have been different.

But counsel for defendant and appellant argues that improper evidence was admitted, and that much of the evidence which is urged in support of the verdict was inadmissible. He objected and still objects strenuously to the introduction of the testimony of the hackman, Chapin, to the effect that at some time and about 10 o'clock he saw a switch engine upon the track at the crossing, without a tail light; that this engine almost ran into him, and that he heard no bell or gong sounded. It is urged, in short, that proof of prior negligence cannot be had in

support of an allegation of negligence at a particular time. We must remember, however, that in the case at bar practically all the evidence is, or should be, in the possession of the defendant. The victim of the accident is dead. The evidence is to us conclusive that he was run over by a switch engine belonging to the defendant company. The question to be decided was not merely whether the defendant failed to ring a bell at the crossing at the time of the accident, or whether it had a tail light upon its engine, but what was the cause of the accident, and was there evidence to overcome the presumption of due care on the part of the deceased. It was claimed that the deceased could see the engine at a distance of 150 to 200 feet. The hackman was allowed to testify that he almost ran upon an engine without seeing it. It was claimed by the defendant that the bell was sounded at the crossing, and could have been heard by the deceased. It is shown that a strong wind was blowing, and it is sought to be proved by the plaintiff that the hackman was almost run into by an engine, without hearing any gong sounded. All of this evidence was admissible as tending to show the physical facts attending the accident. Not merely was this evidence admissible on the question of contributory negligence and as to whether the deceased could have seen and heard the engine in the storm or not, but for the purpose of arriving at the real cause of the accident. There were no eyewitnesses to the accident, and proof of this nature is the only proof that could be adduced, unless the defendant himself chose to furnish better evidence. This is not a case where negligent acts on other parts of the road or on other occasions, or committed by other engineers than those involved in the accident, are concerned, but a case in which the acts and conduct of the engineers and servants, and the physical equipment of the engine engaged in the same general switching transaction in which the injury occurred, are involved. We think the evidence was admissible. See Chicago v. Powers, 42 Ill. 169, 89 Am. Dec. 418; Rich v. Chicago, M. & St. P. R. Co. 78 C. C. A. 663, 149 Fed. 79; Northern P. R. Co. v. Lewis, 2 C. C. A. 446, 10 U. S. App. 254, 51 Fed. 658; Grand Trunk R. Co. v. Richardson, 91 U. S. 469, 23 L. ed. 362; Cotner v. St. Louis & S. F. R. Co. 220 Mo. 284, 119 S. W. 610; Woodward v. Southern R. Co. 90 S. C. 262, 73 S. E. 79; State v. Manchester & L. R. Co. 52 N. H. 528, 548; Davidson v. St. Paul, M. & M. R. Co. 34 Minn. 51, 24 N. W. 324; Swadley v. Missouri P. R. Co. 118 Mo. 268, 40 Am. St.

Rep. 366, 24 S. W. 140; Aurora v. Brown, 12 Ill. App. 122 (affirmed in 109 Ill. 165) ; Goodwin v. Atlantic Coast Line R. Co. 82 S. C. 321, 64 S. E. 242; Lannis v. Louisville R. Co. 16 Ky. L. Rep. 446; Field v. New York C. R. Co. 32 N. Y. 339; Pennsylvania Teleph. Co. v. Varnan, 2 Monaghan (Pa.) 645, 15 Atl. 624; Quinlan v. Utica, 11 Hun, 217; Presby v. Grand Trunk R. Co. 66 N. H. 615, 22 Atl. 554; Galveston, H. & S. A. R. Co. v. Kutac, 76 Tex. 473, 13 S. W. 327; Bourassa v. Grand Trunk R. Co. 75 N. H. 359, 74 Atl. 590.

We now come to the proof of the damages.  Appellant insists that since no mortality tables were introduced, there is no proof of the expectancy of life either of the deceased or of his relatives.  As we understand the law, and as held by this court in the case of Ruehl v. Lidgerwood Rural Teleph. Co. 23 N. D. 6, — L.R.A.(N.S.) —, 135 N. W. 793, the admission in evidence of such tables is not necessary to a recovery of substantial damages.  According to the common law, standard tables were competent and proper evidence, but they were not absolutely necessary.  Under § 7303 of the Code of North Dakota, the Carlisle tables are admissible, but their admission is not necessary.  We have discussed this question at some length in the case of Ruehl v. Lidgerwood Rural Teleph. Co. before referred to, and we believe that no extended discussion is necessary here.  We know that counsel for the appellant makes a distinction between a case where the expectancy of the life of the deceased and the expectancy of the life of the beneficiary are concerned, but we can find no such distinction in the authorities.  We have examined the cases cited by appellant, and the case of Rhoads v. Chicago & A. R. Co. 227 Ill. 328, 11 L.R.A.(N.S.) 623, 81 N. E. 371, and the notes to that case as reported in 10 Ann. Cas. 111, 113, and can find no support for the proposition.  All that the cases hold is that there must be some proof of a pecuniary loss to the beneficiaries, and that in such cases mortality tables are competent evidence.  All that the case of Rhoads v. Chicago & A. R. Co. supra, held was that in a case where the mortality tables had been introduced it was error for the court to instruct the jury that a father was entitled to a sum equal to the earnings of his son during the son's expectancy of life, when the tables showed that the life of the son would have been twenty-eight years longer than that of his father.  In other words, the court held that all the father could possibly recover would be a sum equal to the support that he

would receive from his son during his, the father's, life. We have, indeed, examined the Illinois Reports with a great deal of care, and we have yet to find a case in which a judgment has been set aside because of the failure to introduce mortality tables in evidence. It is well established, indeed, as we have shown in the Ruehl Case, that the court may itself take judicial notice of such mortality tables. It is also well established that the things of which a court may take judicial notice are things which are generally known. Taking judicial notice, as we do, and may, of the Carlisle expectancy tables and of the expectancy of life of the deceased, which was 37.14 years; of the father, which was 18.97 years; and of the mother, which was 22.50 years if we put her age at 48; of the youngest child, which was 45 years; and of the next child, which was 42.17 years; and considering the earning capacity of the deceased, shown on the trial, we are not prepared to say that the verdict was excessive, or that only nominal damages should have been awarded. Little v. Bousfield & Co. 165 Mich. 654, 131 N. W. 63.

But defendant and appellant says that there is no proof of any pecuniary loss on which a recovery can be based, even if the mortality tables had been introduced or were unnecessary. Counsel argues that there is no direct proof as to the money contributed by the son to his family, or of the monetary condition and needs of that family. We do not so understand the evidence. We have held in the case of Satterberg v. Minneapolis, St. P. & S. Ste. M. R. Co. 19 N. D. 38, 121 N. W. 70, that a legal obligation to support is not necessary to a recovery in such cases. The evidence shows that the boy's earning capacity was about $4 a day; that he was in business with his father; and that he and his father made no division of the profits, but turned all of their earnings into the family fund. The evidence shows that the father was fifty-three years of age, and we must infer that the mother was at least forty-six. There was a girl of fifteen years of age, and a boy of about nineteen. The earning capacity of the family as a whole was not, it is true, shown, but it was shown that the father and son were both carpenters and concrete makers and in what may be termed the poorer class of society. In fact, the evidence conclusively shows that all of the earnings were turned into a joint fund for the family support. We think that the evidence was sufficient to warrant the recovery of substantial dam-

ages, and that the amount recovered ($2,000) should not, under the circumstances, be deemed in any way excessive.

The judgment of the District Court is affirmed.

SPALDING, Ch. J.    This case is governed on the merits by Kunkel v. Minneapolis, St. P. & S. Ste. M. R. Co. 18 N. D. 367, 121 N. W. 830, and inasmuch as that states the law of this jurisdiction, I concur.

## On Petition for Rehearing.

BRUCE, J.    Counsel for appellant files a sweeping petition for rehearing, alleging that the opinion in chief "is in decided conflict with, and ignores controlling decisions of, this court.    That it is based upon errors of law and errors of fact, upon omissions of material facts and misleading statements of fact; that it appears that it was rendered hastily, and that the facts as shown by the record were not carefully considered."    When we come to a specification of the errors alleged to have been committed by the court, however, we find that they revolve around its conclusion as to contributory negligence, its allegation that the night was stormy and that such storm was of any moment; that there was proof by which the jury might find negligence in the case; that the fact that the defendant had introduced no evidence was of any moment; that the opinion of the court was based upon the assumption that the witness, Chapin, saw the switch engine testified to at 11:15 o'clock, and not at 10:20 o'clock, P. M.; that evidence of a switch engine passing the crossing at 10:20 without a light was not admissible; that the court arbitrarily assumed that decedent's mother's age was forty-six years, and that the court held that damages could be based on the total life expectancy, not merely of the deceased, but of his beneficiaries.

From the petition we now assume that counsel for appellant concedes that expectancy tables are not necessary to be introduced in such cases.    He says: "We will assume, for the sake of argument, that no expectancy tables are necessary in cases of this kind, although we venture to predict that the loose practices thereby permitted will be of untold harm."    If such is the result, this court cannot possibly be charged with inaugurating the custom or with overruling the established principles of the past.    As stated in the opinion, we have yet to find, and

counsel for appellant has not been able to point out, any authorities which make that introduction necessary. When introduced they are introduced as an aid to the jury, and not on the theory that without their introduction the jury would have been unable to act. "While various forms of life tables are usually used for the purpose of assisting the jury in estimating the expectation of life, they are not essential. The jury may make their estimate from the other evidence as to the age, health, habits, and physical condition of plaintiff." 13 Cyc. 198. See also cases cited in original opinion and in Ruehl v. Lidgerwood Rural Teleph. Co. 23 N. D. 6, — L.R.A.(N.S.) —, 135 N. W. 793.

Counsel, we know, criticizes the court for assuming that the mother of the deceased must have been forty-six years of age, and for then stating that if she was forty-eight years of age, her expectancy of life would be 22.50 years. "It has," he says, "been our experience that men sometimes marry women of all ages; and how the court can deliberately find the age of a person, and arbitrarily insert that age in the record, and then figure out the mother's expectancy, so as to arrive at what her damages would have been by reason of the death of her son, is beyond our ken." The answer to this is that the court did not assess any damages in this case. It merely stated the life expectancy of the different parties interested. It did not even, as counsel inferred, suggest or hint that the plaintiff would be entitled to a recovery which would be based upon the entire life expectancy of any or all of the relatives of the deceased, or of the deceased, or that any allowance could be made in regard to the minors after they had reached the age of twenty-one. It merely stated what the tables would have proved if they had been introduced, as being something of which the court might take judicial notice. In our opinion, indeed, the exact age of the mother is immaterial. If she had married the father of the deceased when at the age of fifteen, or, on the other hand, at the age of thirty, it would have made no difference in our conclusion. The jury were justified at any rate in finding that she had some expectancy. In our opinion the verdict of the jury is abundantly sustained on the basis of damages to the father and the minor brothers and sisters, alone, and we can exclude the mother from the case altogether. Sieber v. Great Northern R. Co. 76 Minn. 269, 79 N. W. 95. It is not the habit of courts to set aside verdicts of this kind, for reasons of this kind. "To justify interference by the court

with ·the verdict of the jury, it must appear that some rule of law has been violated, or else that the verdict is so excessive or grossly inadequate as to indicate partiality, passion, or prejudice." 13 Cyc. 376. The trial court committed no error in regard to the age of the mother. The matter was not submitted by any instruction to the jury. We can see no evidence of passion or prejudice, nor any violation of law, or that the self-evident truth which we stated in our opinion has any effect on the case.

Counsel for appellant charges that on the question of contributory negligence of the deceased the court erred in "overruling controlling decisions. Also, its conclusion is based on an erroneous and misleading statement of fact." "Even if we were to assume that the statements in the opinion as to the night being 'stormy' are true," counsel says, "we still have a condition existing that anyone who cared to use his eyes could see, one who cared to look on that night could see a box car from a distance of 150 to 200 feet,—this with the cold wind and everything else. What possible difference, we ask, can it make how cold the night was, or how great was the velocity of the wind, or even how stormy it was, if, considering all these conditions, one could see a man 30 feet distant and a box car from a distance of 150 to 200 feet?" Why counsel is so reluctant to concede that the night was stormy we are unable to understand. The word "stormy" does not necessarily include either rain or snow, nor does the word "storm." It includes "a violent disturbance of the atmosphere, attended by wind, rain, snow, hail, or thunder and lightning. Storm is violent agitation or commotion of the elements by wind, etc., but not necessarily implying the fall of anything from the clouds." (Webster's International Dictionary.) The word "stormy" includes "agitated, with furious winds." (Ibid.) Whether snowing or not, the fact remains that it was bitterly cold; that a strong wind of the velocity of from 30 to 40 miles an hour was blowing. There is also evidence that sand and gravel and débris were flying in the air. Counsel says that "this court has already decided that the presumption of due care created where one has met death, no one seeing the accident, only arises where doubt exists as to the deceased's ability to see or hear the train or cars which caused his death." There is no doubt upon this proposition. But can we say, as a matter of law, that one battling against a storm and cold weather of this kind was necessarily negligent

because he did not see the outlines of a car or of an engine in time to avoid the accident? All the evidence as to sound and sight that there is is that when "one got on this crossing he could see down in the direction of the depot 150 or 200 feet by good electric light;" that "a man 125 feet south of the track would have an unobstructed view" of the same; that "a man standing at the crossing and looking down towards the depot could tell a man 30 feet away and the outlines of a box car 150 to 200 feet" away. It is argued, we know, that the wind was blowing in the direction of the deceased as he approached the track. If it was blowing in his direction as he approached the track it was not blowing in his direction when he was upon it. Nor is the blowing of the wind any conclusive argument. The deceased would naturally lower his head. If sand and dust and gravel were blowing (of which there is some evidence) he would probably be more or less blinded. A 30 to 40 mile wind, with the thermometer at 18 degrees below zero, is not a thing that is easy to be battled with. He had a right to rely on some degree of care on the part of the railway company. If he could have seen a man at 30 feet, or the outlines of a car at 150 feet, the men in charge of the railroad engine could have seen him. The mere fact that a wind is blowing towards a man is by no means conclusive as to the carriage of sound. It is a well-known physical fact that sound is not made more distinct in a gale than it is on a quiet evening. It is a matter of common knowledge that the rush and whistle of the wind and the beating of the wind against one's face and against one's ears has a tendency to interfere with, as a rule, rather than to aid, hearing. Not merely is the conveyance of sound impeded by a heavy storm, and the sound waves broken up by the turbulence of the air, but there is a confusion of sounds, and hearing is a psychological, as well as a physical, function. It is just as necessary to distinguish and disassociate as it is that an impression shall be made upon the eardrum. We are surrounded, in fact, by myriads of sounds, and hearing is merely discrimination and disassociation. "The jury," says the supreme court of Wisconsin in the case of Phillips v. Milwaukee & N. R. Co. 77 Wis. 349, 355, 9 L.R.A. 521, 46 N. W. 543, "may also very properly have considered the facts that it was a cold and stormy day, and that the deceased had a shawl about his head and ears, which might have interfered to some extent with his seeing as well as hearing. *It was not a day for taking ob-*

25 N. D.—27.

*servations, but for keeping straight on.* The employees of the road kept themselves protected from the weather on the engine, where they could not look out for these wild, detached cars that they had sent down the track, or warn the deceased of their approach. *These facts may well modify the rule that it was the duty of the deceased to look just at the time when the cars were near him.* It may be that he looked in that direction, but when these detached cars had not yet started on the side track. He is not here to be questioned as to what he did or did not do, and his conduct is entitled to all reasonable probabilities. One thing is certain,—that he did not know that these cars were creeping towards him and so near him when he undertook to cross the track. We think the jury might have properly found, as they did, that the deceased was not guilty of any want of ordinary care under the circumstances of the case that contributed to his death." In the case of Frederickson v. Iowa C. R. Co. — Iowa, —, 135 N. W. 12, we have a very similar case, and in it we find the following language: "It is said that the court should have held as a matter of law, that deceased was guilty of contributory negligence, but we cannot assent to the proposition. While the crossing in question was so open that the approach of a train could have readily been seen by the exercise of care under ordinary circumstances, the record shows that on the afternoon in question the wind was high, and that at times the air was so full of drifting snow that a person could not see far. What precaution the deceased may have taken when approaching this crossing cannot be certainly determined, but he had used it frequently for many years, and knew that it was dangerous to attempt to cross the track without exercising care; and the presumption that we have already referred to in connection with evidence of the condition of the weather at the time was, we think, sufficient to take the case to the jury." The only material difference in the cases is the fact that in the Iowa case there was evidence of flurries of snow, while in the case at bar there was evidence of flurries of sand and gravel and dust. When it comes to a matter of eyesight or hearing, we think few who are acquainted with the conditions in the western part of North Dakota would contend that one can hear or see better in a flurry of dust than he can in a flurry of snow. It is true that in the Iowa case there was some evidence that the statutory signals had not been given, and therefore, some evidence of negligence. There is, in the case at bar,

however, evidence from which the jury could infer negligence, also. We say this advisedly, as criticism was made in the petition for rehearing upon the statements of the opinion in chief. We did not, in that opinion, hold that anything was negligence as a matter of law. We were merely considering, and we are merely considering here, the question as to whether there was evidence from which the jury might infer negligence. It is to be remembered, too, in this case, that a verdict of the jury being rendered, it is for this court to resolve conflicts in the evidence in favor, rather than against, that verdict.

The complaint alleges negligence in maintaining an improperly guarded frog in the highway. That there was a frog in the highway is undisputed. It was not in the planking, but about 4 feet therefrom in the highway. The jury was perfectly justified, from the evidence, in holding that the deceased was caught in this frog, and even if headlights and tail lights were maintained upon the engines of the defendant, the condition of the crossing may still have been the proximate cause of the injury. Added to this was the testimony of the defendant's engineer that he did not see the deceased, and did not know of the accident at the time of its occurrence. The testimony shows that the highway was 80 feet in width. The planking was only 16 feet. The presumption is that the deceased was not guilty of contributory negligence, and that the instinct of self-preservation was in operation. The jury would have been perfectly justified from the evidence in holding that the deceased was caught in this frog, and even if headlights and tail lights were both maintained upon the engine, such fact may have been the proximate cause of the injury. It was for the jury to say whether, under the circumstances of the case, the defendant was negligent in running this engine across this crossing in the way that it did and on the night in question. Even if the deceased could have seen a box car 150 feet away, it does not follow by any means that it was negligence on his part to cross the tracks, nor when he has a perfect right to use the whole of the highway would it be presumed to be negligence for him, on a dark night and in a storm such as that which prevailed on the night in question, to walk on the side of the few feet of planking that was furnished. In McNamara v. New York C. & H. R. R. Co. 136 N. Y. 650, 32 N. E. 765, it was held that the testimony of a witness as to the ability of the deceased to see was not conclusive upon the jury, but merely an expression

of opinion. Even if we suppose that he could have seen an engine 150 or 200 feet away, there is no evidence or presumption that the engine was less than that distance from him, or even that distance from him when he attempted to cross the track. On this point, the fact that there were three men in the switching crew, and that the testimony of none of them is preserved, nor do the engineer or fireman testify upon the subject, is full of significance. If, when he reached the track, the engine first came within the 200-feet limit of sight, it is not unreasonable to suppose that plaintiff when he saw it started or jumped to one side. In doing so he might have been caught in the frog. He may have been walking in the full highway anyway as he had a right to do, and stumbled over the frog. A train running at the rate of 20 miles an hour would take less than 5 seconds to travel the distance of 150 feet, and less than 7 seconds to travel the distance of 200 feet. If it was running at the rate of 10 miles an hour it would take less than 11 seconds and 14 seconds, respectively. Can any one say, as a matter of law, that under the circumstances of the case contributory negligence is absolutely shown, or that an inference of negligence on the part of the defendant is not shown? It is alleged by counsel that a passenger train was due at about the same time, but where is there any testimony in the record from any member of that passenger crew? It was the duty of the passenger crew to keep a lookout at the crossing just as much as it was the duty of the men on the switch engine. Counsel for appellant wishes us to excuse defendant by the assumption of an accident, which, in itself, is by no means free from a suggestion of negligence. The rule of probabilities was laid down by the supreme court of Idaho in the case of Adams v. Bunker Hill & S. Min. Co. 12 Idaho, 637, 11 L.R.A. (N.S.) 844, 89 Pac. 624, as follows: "Where the evidence in a personal injury case is so uncertain as to leave it equally clear and probable that the injury resulted from any one of a number of causes that might be suggested, then, and in that case, a verdict for plaintiff would be pure speculation, and could not be sustained; but where the evidence, although circumstantial, is such that it would appear possible that the injury resulted from any one of several causes, and yet it points to the greater probability that it resulted from the specific cause charged by the plaintiff, a nonsuit should not be granted. In the latter case the jury would be justified in returning a verdict in favor of the plaintiff,

although it be possible that the injury may have resulted from some other cause. The law does not anticipate, or attempt to exclude mere possibilities. If upon any fair construction that a reasonable man might put upon the evidence, or any inference that might reasonably be drawn therefrom the conclusion of negligence can be arrived at or justified, then the defendant is not entitled to a nonsuit, but the question of negligence should go to the jury." In the case at bar the only theory of the accident, outside of the mere suggestion of contributory negligence from not looking for the car, and of the passage of the passenger train, is that the plaintiff crawled through the cars. All the evidence on this subject is the testimony of one of the witnesses that an engineer while switching cars stopped for about three minutes upon the crossing. The string of cars at the most, and at any time, was only from seven to ten cars in length. The time when the stop was made upon the crossing is not testified to, and is not connected with the time of the accident. It is admitted that there were three men in the switching crew, as well as the engineer and fireman. Is there any shadow of proof that at this time the plaintiff's decedent crawled beneath the cars, and is not the probability overwhelming that if he had attempted to do so, one of the four men would have seen him? The theory is so speculative that it is not worthy of consideration.

The evidence on this point was brought out on the examination of the witness Wordeman, the engineer of the switching engine, and is as follows:

Q. Did you at any time push five, six, or seven cars over the crossing that night?

A. No, sir. There were cars west of the crossing that night pushed by my engine. I took several cars. It might have been seven to ten. I have no way of finding out except how far we came. I pulled them up. My engine was facing east when I was pulling. I backed my engine up. It was some time about 9 o'clock when I pulled those cars up there. I cannot say that was the only time I pulled any cars up there. My engine was facing east and pulling a string of from seven to ten cars. I pulled over this crossing probably four or five times, I would say several times. I pulled over this crossing sometimes two and three or four car lengths.

Q. The times you pulled over the crossing, did you stop for any length of time?

A. Once we stopped for a few minutes.

Q. How much? Three minutes or four minutes, or how long?

A. I could not say. I did not look at my watch.

Q. Was it more than three minutes?

A. Might have been. I stood there some length of time. I will not swear that I was on that crossing five minutes. I will swear that I was on that crossing three minutes.

Q. What for?

A. I do not know.

By defendant: You were watching for signals from the switchmen while you were stopping on the crossing, weren't you?

A. Yes.

Prior to this time the witness had testified: "I tell the court that I run and switched that engine all that night back and forth across the crossing. I run my engine across the crossing that night. I cannot say when I first commenced to run across that crossing. It may have been at any time after 7 o'clock. I cannot tell this court at what hour I went across this crossing. It was exactly 12 o'clock when I left the engine. Up to the time I pulled the engine in and went to dinner, from 10 o'clock, I had been switching in that part of the yard and over this crossing at various times. I was throwing these cars back on the various tracks in the yard at various times as a switchman called upon me to switch them back. While doing this I had occasion at various times to pull up over this crossing, may be five or six times. During those times I would pull not exceeding five car lengths over the crossing."

Section 4320 of the Code provides that "all railway companies operating a line of railway in this state shall build or cause to be built and kept in good repair, good and sufficient crossings over such line at all points where any public highway in use is now or may hereafter be intersected by the same." Subdivision 2 of § 4321 provides that "plank shall be firmly spiked on and for the full length of the ties used in the roadbed of such railway where such crossing occurs, and shall be laid not more than 1 inch apart except where the rail prevents; the plank next inside of the rail shall not be more than $2\frac{1}{2}$ inches from the inside

surface of such rail, and the plank used in the crossing shall not be less than 3 inches in thickness and so laid that the upper surface of the plank shall be on a level with the upper surface of the rail; *such plank shall extend all along the railway the entire width of the highway grade, and in no case less than 20 feet."* The evidence is conclusive that this planking did not extend the whole width of the highway. Such being the case, the instruction of the court to the jury was perfectly proper which charged that "if you find by a preponderance of the evidence that a switch frog was constructed by the defendant railway company within the grade of the highway, within the grade of the street at the crossing at which the deceased was killed, if you find he was killed at such crossing, then it is for you to determine whether or not the construction and maintenance of such frog in a crossing within the grade of the highway or street is an act of negligence; that of itself would not entitle the plaintiff to recover in this action unless you are further satisfied by a preponderance of evidence that the erection and maintenance of such frog within the crossing and within the grade of the street was the proximate cause of the death of the deceased." These facts alone were sufficient to send the case to the jury. United States Brewing Co. v. Stoltenberg, 211 Ill. 531, 71 N. E. 1081, 17 Am. Neg. Rep. 193.

In the case of Korab v. Chicago, R. I. & P. R. Co. 149 Iowa, 711, 41 L.R.A.(N.S.) 32, 128 N. W. 529, the court said: "The admitted facts make it practically certain that deceased, while walking or running by the side of the moving train in the direction of the switch he was expected to close, stepped between the ends of the moving cars for some purpose not disclosed by the evidence, and, catching his foot in the unblocked guard, was quickly drawn under the wheels. There is no claim on the part of appellee that frogs or guards of this kind are not a source of peril to train men having occasion to walk over them in the performance of their duties, nor is it claimed that such peril may not be measurably removed or lessened by the use of blocks or wedges for that purpose. Indeed, it appears from appellee's evidence that blocks were formerly in use in its station yards, but for some reason not explained had for a considerable period been abandoned. Service of train men and switchmen in railway station yards is essentially dangerous at best; but it is incumbent upon the companies operating them to use reasonable care to make them as safe for their employees as is consistent

with the proper operation of their roads. In the making up of trains, and the handling, moving, and switching of cars, train men are required to walk upon and over the yard tracks at all times of the day and night; and ordinarily they must of necessity move with quickness and celerity from point to point, making it quite impossible that in every instance they should carefully survey their path, or give close attention to the planting of each footstep. They may rightfully depend, to some degree, upon their employers to perform their duty to keep the surface of the yards free from all perils not inherent in the reasonable construction of the road and prosecution of the business for which they are intended. . . . We are therefore of the opinion that upon the conceded facts a finding of the jury that defendant was negligent in failing to block or protect the frog in question would have sufficient support in the record. That the existence of the unblocked frog was the proximate cause, or at least a proximate cause, of the death of deceased, is too clear to require argument. The debatable ground in the case, and the one upon which we may assume the trial court felt compelled to hold against the right of recovery, is upon the question whether the appellant sufficiently negatived the existence of contributory negligence on part of the deceased. It is strenuously contended by appellee that there is no showing whatever of the reason or cause which led deceased to step between the cars upon the frog; that there is no evidence that in doing so he was acting in the line of his duty, or was in any manner using care for his own safety; but, on the contrary, the very fact that he did step into such place of danger shows conclusively his contributory negligence. Some of these propositions ignore rules which have been thoroughly settled by this court. *As has already been noted, no living witness appears to testify as to the acts,* movements, or conduct of the deceased from the time he disappeared in the direction of the switch until he met his death a brief moment later. At that time he was in the performance of his duty in the appellee's service, and there is no suggestion that he was not also exercising reasonable care for his safety. Under such circumstances the appellee, as administrator, is *entitled to the benefit of the presumption that deceased, moved by love of life and the ordinary instinct of self-protection and self-preservation which is characteristic of living reasoning beings, was in the exercise of reasonable care to that end.* . . . The Dalton Case [Dalton v. Chicago, R. I.

& P. R. Co. 104 Iowa, 26, 73 N. W. 349] involved a highway-crossing accident occurring in the nighttime, without living witnesses of the conduct of deceased; and this court, while conceding that under the circumstances it was the duty of the deceased to stop, look, and listen before venturing upon the crossing, held that, in the absence of any evidence concerning his conduct in that respect, there was a presumption that he did use due care, or, in other words, that he did stop, look, and listen. Indeed, to say that, in the absence of other evidence, the deceased is presumed to have been exercising reasonable care, is, in the very nature of the case, to presume that he did the things, or took the steps, or exercised the caution, which reasonable care required him to do or observe. . . . In Baltimore & P. R. Co. v. Landrigan, 191 U. S. 462, 48 L. ed. 262, 24 Sup. Ct. Rep. 137, the deceased, a railway employee (though not a train man), was run over and killed in the station yard in the city of Washington. No one saw the accident. In some manner he had been struck upon the track, his legs severed or crushed, and his body was found lying near at hand. The trial court instructed the jury that, in the absence of all testimony showing 'whether deceased stopped, looked, and listened before going upon the track, the presumption would be that he did.' In approving this instruction the Supreme Court says: 'We know of no more universal instinct than that of self-preservation—none that so insistently urges to care against injury. It has its motives to exercise in the fear of pain, maiming, and death. There are few presumptions based on human feelings or experience that have surer foundations than that expressed in the instruction objected to.' . . . In Johnson v. Hudson River R. Co. 20 N. Y. 65, 75 Am. Dec. 375, 12 Am. Neg. Cas. 336, discussing the same question, the court says: 'The natural instinct of self-preservation would stand in the place of positive evidence.' The presumption is something more than a mere shadowy generality. In the absence of direct evidence the presumption supplies its place, and if the issue of contributory negligence is the only obstacle to recovery it is sufficient to support a verdict for the plaintiff. True, this presumption may be overcome by a showing of other circumstances from which the jury may fairly conclude that deceased was not in fact exercising due care; *but in the nature of things this counter showing can rarely be so overwhelming and conclusive as to make the question whether the presumption has been fairly*

*overcome a matter of law."* See also Bickel v. Pennsylvania R. Co. 217 Pa. 456, 118 Am. St. Rep. 926, 66 Atl. 756, and numerous cases cited in the opinion just quoted from.

So, too, we still adhere to the proposition that the evidence that an engine was seen crossing the crossing an hour or so before the accident was admissible, if not to show custom, to show the condition of the trains and the method of the use of the track on the night in question, there being no eyewitnesses to the death, and such facts being pertinent. There is no contention that any foreign railway company was using the tracks. There is no dispute that two of these switch engines of the company were using the tracks. There is no dispute that one engine passed the crossing a number of times. If one of these engines was seen without a tail light an hour before the accident, the evidence of such fact may not be conclusive, but it is competent.

In this connection, as well as in connection with the admissibility of the evidence in regard to the condition of the lights upon the engine before the accident, the case of Southern R. Co. v. Posey, 124 Ala. 486, 26 So. 914, is suggestive. In that case the court held that in an action against a railway company for injuries sustained at a crossing, and where it did not appear that the driver of the wagon knew the condition of the crossing, or that, in the darkness, it could have seen the defect which caused the accident, his deflection within the road from the usually traveled part was not negligence, *he having a right to assume that the entire width of the road was in proper condition. The court also held that testimony of a witness that he came near having a similar accident at the same place a short time before* was competent as tending to show an unsafe condition of the crossing existing at the time of the accident. See also Malmstrom v. Northern P. R. Co. 20 Wash. 195, 55 Pac. 38.

In the case of Chicago & N. W. R. Co. v. Netolicky, 14 C. C. A. 615, 32 U. S. App. 168, 406, 67 Fed. 665, it was held that "it was not error, in any action against a railway company for damages for an accident at a grade crossing, to permit witnesses who are familiar with the locality to testify to narrow escapes they have had at the same crossing, in connection with descriptions of the locality, for the purpose of showing the nature of the crossing and the difficulties of travelers in passing over it."

"The questions of evidence that arise in actions for death," says Tif-

fany in his work on Death by Wrongful Act, § 189, "are for the most part the same as those that arise in ordinary personal injury cases. It is to be observed, however, that by reason of the death of the person injured it is often impossible to prove the facts and circumstances immediately surrounding the injury, and especially the absence of contributory negligence of the deceased, with the same precision and fullness that would be required in an action in which the person injured was alive and able to testify. For this reason, courts incline to greater liberality in this class of cases in allowing the questions of the negligence of the defendant and of the contributory negligence of the plaintiff to go to the jury upon slight evidence." In the case of Chicago & A. R. Co. v. Carey, 115 Ill. 115, 3 N. E. 519, we find the following: "There was no witness of the occurrence. Deceased spent the evening at the store of one Hart, on Fifty-first street, about five blocks east of the appellant's tracks, and was last seen before the injury, by Hart, about 12:30 A. M., when deceased left Hart's store to go to his home, west of the track, and started west on Fifty-first street. . . . About half-past 1 o'clock A. M. deceased was found in a water-closet, about 400 feet west of the tracks, alive, with only one shoe on. His face and hands were bruised, and foot crushed. There was blood all the way from the track and Fifty-first street to this closet. Deceased's other shoe was found in the morning on the north side of Fifty-first street, wedged in between the track and the boards of the sidewalk. At the trial, after the plaintiff had introduced all of her evidence and rested, defendant's counsel moved the court to dismiss the case for want of sufficient evidence to maintain it; and that motion being overruled, evidence was introduced on the part of the defendant, and after all the evidence was in, defendant's counsel again asked the court to instruct the jury that upon the evidence before them it was their duty to find a verdict for the defendant. The court refused to so instruct, and these rulings of the court are assigned as error. Had this instruction been asked at the conclusion of plaintiff's evidence, it should then have been given, as there had been then introduced no evidence of defendant's negligence; all the evidence looking in that direction being that of a witness who, at the probable time of the accident, was three or four hundred feet away, and testified that he had no recollection of hearing the whistle or bell. But the testimony introduced by the defendant furnished such evidence

tending to show negligence that it was then, in our opinion, proper for the court to refuse such an instruction; and if so, appellant has no just ground of complaint for either one of the court's rulings. Defendant's testimony showed that about midnight a gravel train came in from the south and stopped at Fifty-first street. The train was there opened enough to make a cut at the street crossing, and was so left cut in two for a while. Twelve or fifteen cars were pulled over the street to the north side, and the others left on the south side. A short time afterward the train was moved north of Fifty-first street to Forty-ninth street by another engine,—a switch engine,—and put on a side track there, where the gravel cars were to be unloaded. In doing this the engineer of the switch engine testified that, near midnight, he coupled onto the cars of the train which stood north of Fifty-first street, about twelve or fifteen cars north of Fifty-first street, pushed them across Fifty-first street against those standing on the south side, coupled them, and pulled them north over Fifty-first street; that there was a headlight on both ends of the switch engine, and the fireman was all the time ringing the bell. Under such evidence introduced by the defendant, the question of negligence could not properly have been taken by the court from the jury; but it should have been submitted to them to say whether, under the circumstances, there was not negligence in thus pushing these cars across Fifty-first street without the taking of more precaution than appears in this case." In this case exactly the same points were raised by the defendant as are raised in the case at bar, and it is also to be remembered that in Illinois it devolves upon the plaintiff to allege and prove freedom from contributory negligence, which is not the case in North Dakota.

Again, in the case of Phillips v. Milwaukee & N. R. Co. 77 Wis. 352, 9 L.R.A. 521, 46 N. W. 543, we find the following: "There being no witness to this painful accident, how the deceased came to be on the sidewalk at that place, and whether walking north or south on it, must be determined, if at all, by circumstantial evidence. The learned counsel of the appellant contends that it is unaccountable how the deceased came to be there, and it is entirely a matter of conjecture. That may be so, but is it necessary that the plaintiff account for his being on the sidewalk at that time and place? If it is shown that he met his death while walking on the sidewalk where he had a right to be, that is sufficient for

the plaintiff's case, and it is incumbent on the defendant to show that he was guilty of any want of ordinary care in placing himself in that position. It is therefore incumbent on the defendant to account for his being there, and if there is no proof of it, and it is all a matter of conjecture, then it follows that the deceased is presumed to have placed himself where he was killed, with due care, or, at least, without any want of ordinary care. The learned counsel says in his brief: 'Admitting that the deceased had reached that place when struck, is not the manner of his coming there left to conjecture? But verdicts cannot rest upon conjecture.' The verdict in this case does not rest on any conjecture as to how he came there. The verdict for the plaintiff rests rather on the fact alone that he was lawfully there where he had a right to be when he was killed. If the manner of his coming there was not shown, then no negligence of the deceased could be predicated upon it. That was the misfortune of the defendant, and not of the plaintiff. We will not, therefore, consider the plausibility or otherwise of any of the theories of the learned counsel as to how the deceased came to the place where he was killed. The main and important question is, was he struck by the cars while he was on the sidewalk? It seems to be conclusively shown that he was struck and killed at that place. No marks of blood or any traces of his presence on that track west of the sidewalk were found. The presumption is that he was struck and killed where the first blood in that direction was found, which was on the sidewalk. . . . This is not conjecture, but a reasonable inference or deduction from these known facts. The presumption is that he was making the ordinary use of that sidewalk by traveling on it, when he was struck by the car. It would not be a reasonable, but it would be a violent, presumption, that he came to the sidewalk from the north while walking on the defendant's track. He would be a trespasser, and do that which was unlawful to so use the track, and this cannot be presumed. So far, then, the negligence of the deceased is not shown." "Where a person is killed by the negligence of another," said Chief Justice Start in Gilbert v. Tracy, 115 Minn. 443, 132 N. W. 752, "a very strong presumption arises that the deceased exercised due care to save himself from personal injury or death. The presumption is based upon a law of nature, the universal and insistent instinct of self-preservation. The presumption, however, must yield to clear proof of his contributory negligence; but

the question is always one of fact for the jury, unless the undisputed evidence so conclusively and unmistakenly refutes the presumption that honest and fair-minded men could not reasonably draw different conclusions therefrom. . . . There was evidence which was practically undisputed, to the effect that the deceased was wearing a loose jacket, in which there was a tear near the bottom thereof, outside his overalls, on the morning of the day he was injured; that he had been warned that it was dangerous to wear his jacket around the machinery; and that his jacket was found, after the accident, wound around the hand nut on the end of the engine shaft, and that it was the first part of his clothing wound on next to the nut. Such evidence, standing alone, would justify the inference that the deceased was guilty of contributory negligence, but it is not conclusive, as a matter of law, within the rule stated. We are therefore of the opinion that the question of the contributory negligence of the deceased was not a question of law for the trial judge, but one of fact for the jury."

In the case of Union Stock Yards Co. v. Conoyer, 41 Neb. 617, 59 N. W. 950, the court said: "The counsel for plaintiff in error, in an able brief and argument, strenuously contend that there was no evidence which tends to prove that there was any negligence on the part of the company, which was the proximate cause of the injury to the plaintiff; that the verdict of the jury was predicated upon speculation and conjecture, and not upon facts proved or admitted in the case, or inferences deduced from such proved or admitted facts. We will now go back to what we have heretofore alluded to, *viz.,* that the plaintiff in error *did not introduce any testimony, but allowed the case to be submitted to the jury on the evidence on behalf of the plaintiff.* The rule of the law in this state on the subject of contributory negligence, as expressed in the case of Lincoln v. Walker, 18 Neb. 244, 20 N. W. 113, and Anderson v. Chicago, B. & Q. R. Co. 35 Neb. 95, 52 N. W. 840, is as follows: 'In an action for negligence, where the plaintiff can prove his case without disclosing any negligence on his part, contributory negligence is a matter of defense, the burden of proving it being on the defendant.' And the supreme court of Wisconsin has said that there being no witnesses as to how the death of a traveler at a railroad crossing occurred, deceased will be assumed to have been free from contributory negligence, where the circumstances and position in which he

is found *are as consistent with that presumption* as with the presumption of contributory fault. . . . There was no evidence in the case which tends in the least degree to show any contributory negligence or any fault on the part of McAnnelly; and we must consider the case, as to the other points, and the different positions in which McAnnelly was placed, by the evidence, bearing in mind that there is no contributory negligence. After a careful reading of the evidence, we are convinced that there was a strong showing of the bad condition of the track, and sufficient evidence to submit to the jury, and to sustain their finding as to what caused the trucks of the car to leave the track, and also of the knowledge on the part of the company, or lack of it, of this condition; and now we reach the main contention of the plaintiff in error, that there was no testimony to connect the occurrence of the death of Mc-Annelly with the negligence of the company. In Sackett's Instructions to Juries, p. 36, we find the following: 'The jury are instructed that in determining what facts are proved in this case they should carefully consider all the evidence given before them, with all of the circumstances of the transaction in question, as detailed by the witnesses; and they may find any fact to be proved which they think may be rightfully and reasonably inferred from the evidence given, in the case, although there may be no direct testimony as to such fact;' citing Binns v. State, 66 Ind. 428, and in Thompson, Trials, § 1039: 'What inferences are to be drawn from the facts in evidence is, within reasonable limits, a question for the jury.' And again in § 1677: 'In actions for damage for negligence the general rule is, within limits already indicated, that whether the damage which accrued to the plaintiff is the proximate or the remote result of the negligence of the defendant is the question of fact for the jury; that is to say, when doubt arises as to whether the damages are direct and proximate, or speculative and remote, the question should be submitted to the jury under proper instructions.' In § 1678 of the same work is the following statement: 'In an action for damages for negligence, where the evidence entirely fails to connect the negligence with the fact of the accident, the court should direct the jury that the plaintiff cannot recover, though in many cases the physical facts surrounding the accident will be such as to create a probability that the accident was the result of negligence, in which case the physical facts are themselves evidential, and furnish what the law terms

evidence of negligence.' In Bromley v. Birmingham Mineral R. Co. 95 Ala. 397, 11 So. 341, it was held: 'Plaintiff's intestate, a brakeman on defendant's railroad, was killed by falling from a box car, in the top of which near the brake, was a hole, according to some witnesses, 4 feet long, and according to others, 4 feet square. Deceased was last seen alive, standing at the brake, near this hole. Held, that there was evidence for the jury to consider that the death of deceased was owing to the hole in the top of the car. . . . Where evidence is conflicting, or different inferences can be reasonably drawn from the evidence, or where there is any evidence tending to establish the case of the other side, the general affirmative charge should not be given in favor of either party.' . . . In the case at bar the last time McAnnelly was seen alive by any of the witnesses he was about 4 feet from the train, and was apparently looking it over to see that everything was all right, as the train was then completed, or 'made up' as the railroad men term it, and, after it stood for a short time, 'pulled out.' One witness says: 'After things were all right, as a general thing, two of us got on, me and the foreman, McAnnelly, and after we slack back and see that things are all right, get on as a usual thing.' Mr. Breckinridge. 'Yourself and McAnnelly?' 'Yes, sir.' Mr. Smythe. 'And then you would accompany the train to where it was going?' 'Yes, sir.' 'The whole crew?' 'Yes, sir.' It will doubtless be remembered that there was testimony that at the time McAnnelly was killed they were, as the witness stated it, 'pulling out.' This fact of the usual custom of the crew when they were 'pulling out,' coupled with the facts that Mc-Annelly's body was discovered between the rails, stretched out lengthwise, and parallel with the rails, with a mark or track apparently made by the body from a point at which it would have fallen from the car, the forward trucks of which were derailed, to the place where it was found; that the first evidences of the body being upon the track were, as one witness expressed it: 'First mark I could discover was about 6 or 8 feet from where the car left the track.' 'In what direction?' 'East. It looked like the print in the cinders of man's hip and shoulder;' that from here to where McAnnelly's body was found there was a distinct mark, which, as all the witnesses testify, appeared to be made by the hip and shoulder, that there were no blood spots or marks, or indications of any kind or nature whatsoever, on either the rail or ties,

that McAnnelly had been struck by the wheels; that the truck had been derailed, and was running with one wheel on the ties on the outside of the rail, constitute an array of physical facts and set of circumstances which fully warranted the trial judge in submitting the case to the jury for their determination; and, finding as the jury did, they would not be called upon, at any point in the case entering into such finding, to draw any inferences which would necessarily be violative of the rule of law which prescribes that 'inferences must be drawn from facts proved;' nor do we think that the verdict rendered necessarily involved any speculation and conjecture, or other than reasonable and fair inferences, in view of all the facts and circumstances proved on the trial as surrounding the killing of McAnnelly." In the case at bar we have evidence of the frog in the highway. We have evidence that a portion, at least, of the body and of the clothing of the deceased was found in that frog. We have evidence of the fact that a shoe was missing from one of the feet of the deceased. We cannot say, as a matter of law, that there was no evidence to go to the jury on the question as to whether the frog in the highway was a proximate cause of the accident.

In the case of Gray v. Chicago, R. I. & P. R. Co. 143 Iowa, 268, 121 N. W. 1097, 1102, the court said: "Reasonable vigilance to know that a public crossing is clear is a duty resting upon those operating railway trains, and that vigilance must bear some reasonable proportion to the known peculiarly dangerous character of the particular crossing which they are approaching. In this case, as we have seen, the fireman was not on guard at his window, and the engineer was in a position from which no effective view of the crossing could be had. In this manner they swept over the crossing at a very high rate of speed. While such facts do not present a case of negligence *per se,* they do present a situation from which a jury may fairly find actual negligence." In the case of Bolinger v. St. Paul & D. R. Co. 36 Minn. 418, 1 Am. St. Rep. 680, 31 N. W. 856, it was held that it was for the jury to determine whether a flagman or other precautions not used were necessary for the safety of travelers at a particular place, and how far any negligence which might rightfully be imputed to the defendant in any of the particulars mentioned was the efficient cause of the accident. In Patterson on Railway Accident Law, § 164,

25 N. D.—28.

it is said: "There are some authorities for the proposition that when the railway has followed the statutory directions as to giving signals, etc., it has discharged its whole duty in the premises; but the sounder doctrine would seem to be that compliance with such statutory regulations does not necessarily relieve the railway from the necessity of taking such additional precautions as are essential to the safety of passers on the highway." In § 159 of the same work it is also said: "The effect of the railway's nonperformance of the duty of giving notice of the approach of its trains to a grade crossing when that duty is regulated by statute depends upon the terms of the particular statute, but it may be said that, in general, statutory directions as to giving notice of the approach of a train to a crossing must be followed, and a failure to follow them is negligence to persons on the highway injured while crossing the line." In Thompson's Commentaries on Negligence, vol. 6, §§ 7390, 7391, we find the following: "The general rule is that if there is any evidence tending fairly to show actionable negligence on the part of the defendant, or even scant and slight evidence if it is admitted without objection, the case should be submitted to the jury if it might be reasonably and properly concluded that there was negligence. A case should not be withdrawn from the jury unless a recovery can be had upon any view that can reasonably be taken of the facts which the evidence tends to show, and the fact that the defendant offers strong evidence showing that plaintiff must have been mistaken in her version of the accident will not justify the court in taking the case from the jury. But the jury cannot be permitted arbitrarily to declare that certain actions constitute actionable negligence where there is no proper foundation for such a finding, but there must be facts to warrant the inference of negligence. Thus, a mere surmise of negligence is not sufficient to take the case to the jury. The rule is thus expressed by Williams, J., in Toomey v. London, B. & S. C. R. Co. 3 C. B. N. S. 146, 150: 'A scintilla of evidence, or the mere surmise that there may have been negligence on the part of the defendant, would not justify the judge in leaving the case to the jury; there must be evidence upon which they might reasonably and properly conclude that there was negligence.' This language was approved by Bramwell, B., in Cornman v. Eastern Counties R. Co. 4 Hurlst. & N. 781, 786, and may now be considered as the settled law

in England. As has been pointed out in a former volume, however, the legal scholar on the bench should exercise great caution in substituting his own judgment for that of the twelve men on the jury, as in nearly every case the question whether certain facts tend to show negligence is peculiarly a question to be determined from the standpoint of the ordinary man." The case of Whaley v. Vidal, 27 S. D. 627, 132 N. W. 242, is also in point. The night was a bright, moonlight night, and the engine that struck and killed the deceased was drawing a passenger train due at 10:49 P. M. At a point 161 feet northerly of the crossing, there was an unobstructed view of the track to the east, and the train could have been seen at a point 1,400 or 1,500 feet easterly of the crossing, and at other points between that point and the crossing the train could have been seen from the highway for a distance of from 700 to 1,400 feet. The court said: "It is not contended by the appellants that there is any direct evidence showing that the deceased did not stop, look, and listen, but that the circumstances were such that the inference is irresistible that he did not so stop, look, or listen; but we are of the opinion that the court was not authorized to draw such an inference as a matter of law from the facts disclosed in this case. Where reasonable men might draw different conclusions from the undisputed evidence, the question of negligence or contributory negligence is one of fact for the jury; and it is only when the evidence is without material conflict, and is such that all reasonable men must draw the same conclusion therefrom, that the question is for the court. (The opinion then cites numerous cases and proceeds.) In the absence of evidence to the contrary, the law presumes that the deceased exercised such degree of care and caution as the circumstances and the law require, and the burden of proving that he did not rests upon the defendants throughout the case, and is a question for the jury. (Citing numerous cases.) In the case of Texas & P. R. Co. v. Gentry, 163 U. S. 353, 41 L. ed. 186, 16 Sup. Ct. Rep. 1104, the Supreme Court of the United States held, as appears by the fourth headnote, as follows: 'Where no one personally witnessed the crossing of the track by deceased, nor his death while crossing, the presumption is that he stopped and looked and listened for approaching trains; and hence it is proper to refuse to charge that there could be no recovery if deceased, by looking and listening, could have known of the approach of the car

in time to have kept off the track and prevented the accident.'" In the case of Soeder v. St. Louis, I. M. & S. R. Co. 100 Mo. 673, 18 Am. St. Rep. 724, 13 S. W. 714, it was shown by the plaintiff that the deceased was engaged at night in switching cars on a track where there was a rail so worn for the space of from 4 to 6 feet as to make a depression for that distance of an inch and a quarter, so that a car passing over it would be jolted or jarred, and that deceased fell from the car on which he was riding at his post of duty, striking the ground at a point consistent with the theory that he was thrown from the car by the jar in passing over the depression in the rail, and that he was dragged some distance and was killed, though nobody saw the accident. It was held that the evidence was sufficient to authorize the case to go to the jury. In the case of Knudson v. Great Northern R. Co. 114 Minn. 244, 130 N. W. 994, the court said: "The evidence was concededly sufficient to take the case to the jury on the issue of the defendant's alleged negligence in not giving the statutory signals as the engine approached the highway crossing; and the only question presented by the record is whether the evidence so conclusively established the contributory negligence of the intestate as to make the case an exceptional one, and require the judge to decide the issue as a matter of law. There was evidence tending to establish the evidentiary facts following: The intestate was a farmer, who lived 3½ miles from the station, and was familiar with the defendant's railway tracks in the vicinity of the highway crossing; that the highway ran through the village, along the south side of the defendant's roadbed and tracks for about half a mile, where it turned across the railway tracks, one of which was the main and the other the passing track, which was the first track to be crossed in going west; that a person driving along the highway, towards the crossing, when he got within 100 feet of the crossing would have an unobstructed view to the southeast of the railway tracks, the direction from which the engine and cars came which killed the intestate; that there were switch lights, street lights, and the station buildings in the direction from which the engine came; that at the time of the accident it was very dark and hazy, and the wind was blowing from the south; that the engine was equipped with a very dim headlight, apparently no better than a smoky lantern; that the engineer first discovered the intestate when the engine was close to the cross-

ing, some 25 feet therefrom; that the head brakeman, who was sitting on the fireman's side of the engine, cried out, 'Stop,' and the engineer jumped up and began to throttle the engine; he looked out of the window, and the headlight enabled him to see the crossing and also the horses jump on the track; that when the engineer was in the act of closing the throttle the engine struck the team, and the intestate was instantly killed; and, further, that no warning that the engine was approaching the crossing was given. The evidence as to many of these facts was radically conflicting; but, in determining whether the defendant was entitled to a directed verdict, that view of the evidence most favorable to the plaintiff must be accepted. The question then is: Does the evidence so clearly and so conclusively establish the intestate's contributory negligence that fair-minded men could not draw any other conclusion therefrom? If the accident had happened in the sunlight, but one conclusion could be fairly drawn from the evidence; namely, that the intestate must have been guilty of contributory negligence. Such, however, is not this case; and we are of the opinion, in view of the conditions under which the intestate attempted to cross the railway tracks, that the question of his negligence was one upon which fair-minded men might well differ. It is not conclusive from the evidence that the intestate did not look or listen for approaching engines and trains as he neared the crossing, or that, if he had done so, he must necessarily have discovered the impending danger. It may be reasonably inferred that the wind in some degree prevented him from hearing the approaching engine. Nor does it necessarily follow that, if he had looked, he must have seen the engine in time to have saved himself; for the dim headlight in the darkness may have misled him. It is not an unreasonable inference that the headlight might have appeared to him to be stationary, or one of the several lights in the direction from which the engine was coming. That the night was dark, and the headlight a delusion, instead of a warning, is indicated by the testimony of the engineer, who, it will be presumed, was vigilant as he approached the highway crossing, and yet he did not see the intestate's team until he was within 25 feet of the crossing, when he saw the horses jump on the track. Again, the plainest principles of human justice forbid that it should be inferred, as a matter of law, that a man killed by the negligence of another was guilty of negli-

gence contributing to his death, unless the undisputed evidence clearly and fully rebuts the presumption, founded on the universal and insistent instinct of self-preservation, that he exercised due care for his safety. We hold, upon a consideration of the whole evidence, that the question of the negligence of the intestate was one of fact, to be decided by the jury, and not by the judge."

We are not unmindful of the statement to be found in vol. 1, § 556 of Moore on Facts, that "the presumption that a traveler looked and listened before attempting to cross a railroad track does not overcome the presumption that a train approaching in plain view was seen by him. In such a case the presumption of due care would be at variance with the physical facts." We, however, have examined all of the cases cited by the author in his note to the proposition. We fail to see that any of them present a case parallel to the one at bar. In none of them was the train one which was switching backwards and forwards over a crossing, which might be seen passing, but might return without warning, but a train in the proper sense of the word. So, too, in none of them, with the exception of the case of Kwiotkwoski v. Chicago & G. T. R. Co. 70 Mich. 549, 38 N. W. 463, was there evidence that the night was dark and stormy; in other words, that there was a wind of the velocity of from 30 to 40 miles an hour, and dust and gravel and *débris* flying, accompanied by a temperature of about 18 degrees below zero, and in practically all of them there was testimony of eye-witnesses which strongly negatived any idea of due care on the part of the deceased.

We have also spent much time in examining the authorities cited by counsel for appellant, but our examination has satisfied us that none of them present facts similar to those to be found in the case at bar. It is sufficient to analyze but a few of them. The same criticism will apply to practically all.

In the case of Sherlock v. Minneapolis, St. P. & S. Ste. M. R. Co. 24 N. D. 40, 138 N. W. 977, the accident took place in the broad daylight. The evidence showed that there was no natural physical obstruction to a view of the train for nearly a mile, and in addition to this the deceased was observed by at least four witnesses, "and at all times when so observed had his fur collar turned up over his ears, and was looking to the westward, while the train approached from the east."

In the case of Tyndale v. Old Colony R. Co. 156 Mass. 503, 31 N. E. 655, the deceased was operating a velocipede upon a railroad track, and was run over by an express train which was following him. The evidence showed conclusively that the deceased did not have his lanterns lighted upon the velocipede, and this the court held was, in itself, contributory negligence. In addition to this fact was the fact that when last seen he was going at a rate of speed nearly as great as the train which overtook him, and if he had turned his head in any time he could have seen the approaching train in time to escape the accident. Massachusetts, too, is a state in which the burden of proving freedom from contributory negligence is upon the plaintiff. In the case of Bressler v. Chicago, R. I. & P. R. Co. 74 Kan. 256, 86 Pac. 472, the evidence showed that the team moved upon the crossing in a walk; that he could have seen the train from a distance of 155 feet; that he jumped from the wagon, and if he had not done so he would have crossed in safety; and there is no evidence whatever as to the state of the weather or the time of day. In the case of Kwiotkwoski v. Chicago & G. T. R. Co. supra, the evidence, it is true, showed that the deceased was killed on a rainy, dark night, but the evidence also showed that the locomotive had a blazing headlight which lighted up the track for at least a block; that a witness, who was going towards the engine at the time of the accident, saw the headlight plainly, and first saw the train about five blocks away; that the noise of the approaching train was heard by two men in a wood office about 20 feet from the track. In the case of Carlson v. Chicago & N. W. R. Co. 96 Minn. 504, 4 L.R.A.(N.S.) 349, 113 Am. St. Rep. 655, 105 N. W. 555, the evidence showed conclusively that when the deceased was 50 feet from the track a train could have been seen 2,500 feet from the crossing, and the accident happened in the daytime. There, too, was no evidence of any storm or that the weather was cold. In the case of J. F. Conrad Grocer Co. v. St. Louis & Suburban R. Co. 89 Mo. App. 534, the accident occurred at 6 o'clock in the evening, when it was growing dusk. A witness for the plaintiff testified that she saw the train four or five hundred feet away. Several witnesses testified that the noise of the train was audible at this distance. The day was gloomy, but there is no evidence of wind or cold. There is no evidence that the speed of the train was excessive. In the case of Blotz v. Lehigh Valley R. Co.

212 .Pa. 154, 61 Atl. 832, the train could have been seen at a distance of 150 feet, 95 feet from the crossing, though it could not have been seen while passing along the 500 feet nearest to the crossing, until within 15 or 20 feet of the track. There is no evidence in the case as to the time of day or as to the weather. In the case of Connerton v. Delaware & H. Canal Co. 169 Pa. 339, 32 Atl. 416, the accident occurred at 9 o'clock in the evening. At a distance of 50 feet from the tracks the view was unobstructed for 1,000 feet, and the same was true at a distance of 20 or 25 feet from the tracks. The train was coming with a blazing headlight. There is no evidence as to the state of the weather or the time of the year. In the case of Wood v. Pennsylvania R. Co. 177 Pa. 306, 35 L.R.A. 199, 55 Am. St. Rep. 728, 35 Atl. 699, the evidence showed that the train could not be seen from 150 to 200 yards distant. Plaintiff himself testified that he heard it coming, and all of his witnesses had notice of it. It was not a death case, and the court held that in any event the negligence complained of, which was a failure to give a signal, which resulted in the killing of a person on the crossing, could not be held to be the proximate result of the injury which resulted from the body of the deceased being thrown against the plaintiff, who was standing on a depot platform 50 feet away.

In the case of Tomlinson v. Chicago, M. & St. P. R. Co. 67 C. C. A. 218, 134 Fed. 233, the train was a regular passenger train. The view was unobstructed, and the locomotive headlight could have been seen when the train was at any point on the track within a half a mile or more of the crossing, by a traveler upon the highway at any point within 300 feet. It was 6 o'clock in the evening. There was a mist or fog, though there is no evidence that there was any wind or that it was cold. The surface of the highway at 100 feet west of the crossing was 5½ feet below the track. It was dark. One of the witnesses for the plaintiff said that he heard the train and saw the headlight about 4 miles away, and another testified that he saw it about 3 miles distant. In the case of Northern P. R. Co. v. Freeman, 174 U. S. 380, 43 L. ed. 1014, 19 Sup. Ct. Rep. 763, the train could have been seen at 40 feet for about 300 feet. The deceased was driving in a wagon at a trot. Witnesses testified that the deceased looked straight before him, without turning his head either way, and trotted directly

on the crossing, and made no motion to stop until just as the engine struck him; that his head was down; and he was looking at the horses. The train was a freight train, going at a speed not to exceed 20 miles an hour. There is no evidence as to the time of day or as to the condition of the atmosphere or temperature. In the case of Woolf v. Washington R. & Nav. Co. 37 Wash. 491, 79 Pac. 997, the deceased was killed by what seems to have been a solitary engine. At any point between 50 and 100 feet from the track a person could have seen along the track for a distance of 600 feet or more. At any point on the highway between 100 and 475 feet of the crossing, an engine could be seen at a distance of from 475 to 600 or 800 feet from the crossing. The accident happened in the daytime. One witness testified that when the deceased was about 50 feet, more or less, from the crossing, driving at a slow walk, he looked toward the engine, and immediately whipped his horses with the lines in an effort to cross ahead of the locomotive. Another witness testified, however, that he whipped up the horses when he was just about to cross. Though there were eye-witnesses to the accident, there was no evidence of his looking a' any other point or any other time prior to those just mentioned. In the case of Dalton v. Chicago, R. I. & P. R. Co. 114 Iowa, 257, 86 N. W. 273, a verdict had been directed for the defendant in the court below. This was reversed because of the introduction of evidence prejudicial to the plaintiff. In it, however, the court held that where, in an action to recover for the killing of a person at a crossing, plaintiff requested an instruction that in the absence of direct evidence of decedent's conduct, the law presumes him to have been in the exercise of ordinary care until the contrary appears, which presumption should be considered in connection with the facts and circumstances disclosed by the evidence in determining whether he was in the exercise of ordinary care, there was no error of which the plaintiff could complain in the court's instructing that in the absence of direct evidence of decedent's conduct, the law presumes that he exercised ordinary care until the contrary appears; but such presumption does not control if, from the whole evidence, it appears that decedent, in the exercise of ordinary care, could have avoided the collision by stopping, looking, and listening. In this case, however, there was evidence also tending to show that the deceased was asleep at the time of the accident. In the

case of Schmidt v. Missouri P. R. Co. 191 Mo. 215, 3 L.R.A.(N.S.)
196, 90 S. W. 136, the evidence of the plaintiff showed that the acci-
dent took place at 2 o'clock in the afternoon; that the plaintiff could
have seen the approaching train at least some 250 feet distant, and
that the plaintiff did not look when he approached the track towards
the approaching train. This was the testimony of plaintiff's own wit-
nesses. There is no evidence that it was stormy. In the case of Craw-
ford v. Chicago G. W. R. Co. 109 Iowa, 433, 80 N. W. 519, and in
which jurisdiction the burden to show freedom from contributory neg-
ligence was upon the plaintiff, the evidence showed that at a point 300
feet north of the crossing, and until within 150 feet of the track, a
person could have seen an approaching train from the north at all
times; that from 150 feet of the track to the crossing a person could
see an approaching train for a distance of 500 or 600 feet. The train
was running southward, and the plaintiff was going along a road which
was running east and west. When last seen, plaintiff was standing
facing the west. It was clear that he could have seen the train at any
time from 125 to 50 feet from the track, and could have avoided the
accident. There is no evidence as to the time of day or the condition
of the weather. In the case of Chicago, R. I. & P. R. Co. v. Pounds,
27 C. C. A. 112, 49 U. S. App. 476, 82 Fed. 217, for more than 200
yards before the plaintiff reached the railroad crossing he was in plain
view of the approaching train. There is evidence that about 300 yards
from the station there was a cloud of dust; that it was clear that he
could have seen the train during the greater part of his approach. The
accident appears to have taken place in the daytime. In the case of
Pyle v. Clark, 25 C. C. A. 190, 49 U. S. App. 260, 79 Fed. 744, 2
Am. Neg. Rep. 100, the view of the plaintiff was unobstructed for
200 feet. He stopped his horses 15 to 25 feet from the track, sat
quietly in his wagon for a minute, looked towards the train, and then,
without looking again, drove slowly over the track. The accident took
place at 4 o'clock in the afternoon on a clear day. In the case of Hope
v. Great Northern R. Co. 19 N. D. 438, 122 N. W. 997, plaintiff drove
"over the crossing in question with a load of wheat about ten minutes
before the accident, so that he knew the situation there and the location
of the tracks. After unloading the wheat he turned around and re-
turned to the crossing, driving parallel to the tracks and south of them,

not stopping once in this drive. There was a string of box cars on the center track, and other cars on the elevator track, and three elevator buildings all of which shut out the view of the main track from him. . . . The driver looked east as he was going down the elevator bridge, but did not see any train, saw the cars on the elevator track and passing track. It was quite cold and he was dressed warmly, had his cap down about the edge of his ears. The ground was frozen, and the double box on the wagon was empty. The wagon made a noise on the hard road, so that he did not hear the train or any noise except that made by the wagon. From the time he left the east elevator until the collision his team did not stop except that, after he crossed the first track, he pulled up the lines and momentarily stopped them; he said because 'he did not want to gallop over the track.' He said 'they were just standing still for a moment; that is, just for an instant. I jerked them back, and they stopped like that, and away they went again. I was between the box cars when the horses jumped. They took fright.' . . . There was no point after he left the elevator at which it was possible for him to see the main track or the train coming on it from the east. *According to his own testimony he paid no attention whatever to the approach of the train on the main track.* At no time did he stop his horses or listen for the train. The noise of the moving train conveyed no warning to him. The noise of his wagon on the hard frozen ground probably prevented him from hearing it."

It will be seen that in the greater number of these cases there were eyewitnesses to the accident, and that they were not cases where there was any need for the application of the presumption of self-preservation, and in none of the cases were the facts in regard to the weather and the other physical facts similar to those in the case at bar. Where, indeed, in the case at bar is there any evidence of contributory negligence which would overcome the presumption of due care? We must remember in North Dakota that not only is there a presumption of self-protection, but also that the burden of proof of contributory negligence is upon the defendant. Outside of the testimony of the engineer that he rang his bell, all the evidence of contributory negligence on the part of the deceased is to be found in the testimony that: "If a man was looking in the dark that night he might see a man 25 or 30 feet away. There was some lights in the yards that night. There were lights on

the depot. If a man was looking that way he could see further. If he was looking to the east, I think he could see a man at the depot, because the lights would be back of him. Looking from the east to the crossing you could probably see a box car from 100 to 150 feet. That would depend where the light was striking it. I said you could see a man in the dark about 25 or 30 feet if there were no lights beyond them. Looking towards the east you could see a box car in the dark about 150 or 200 feet. I had occasion to look down the yards that night. I was there at the body ten or fifteen minutes. I could see the shadow of the lights at the depot. I could see the outline of the building. I could see the outline of a very few of the cars where they were beyond the light limit. I could see some of them where they were in the light limit." Opposed to this are all of the other physical facts which we have mentioned. The question is, Must there be but one conclusion from the facts proven, probative in its force and sufficient to overcome the presumption arising from the instinct of self-preservation? We do not think so, and we have yet to find any authorities which support the appellant in his contention.

This testimony does not prove contributory negligence as a matter of law, so as to justify this court in taking the determination of the fact from the jury. There is no evidence that at any time before the deceased reached the track, the car or engine which occasioned the accident was within 200 feet of the crossing. The blood found upon the tender of the engine is at least some evidence that it was backed down upon the deceased. The evidence tends strongly to show that he stepped into the frog which was in the highway and from 4 to 6 feet east of the planking on the crossing. The jury were perfectly justified in inferring that when he reached the crossing he was for the first time aware of an engine approaching at a distance of 150 to 200 feet. Such a sight would naturally startle him, and it is by no means improbable that he stepped to the right, off the planking and into the frog. On a dark and stormy night, with a wind blowing at from 30 to 40 miles an hour, and dust, gravel, and *débris* blowing, which some of the testimony shows, it is not by any means improbable that in crossing the track he should have stepped to the side of the planking which he had a right to do, it being the duty of the railway company to plank the crossing for its entire width. At any rate, we cannot say that it would

have been contributory negligence for him to do so. If the approaching train was going at the rate of 20 miles per hour, and when first seen was 200 feet away, it would have reached him in less than seven seconds. If it was 150 feet away, and, going at the same rate, it would have reached him in less than six seconds. If it was going at the rate of ten miles per hour, it would have reached him in less than fourteen seconds and eleven seconds respectively. If his foot was caught in the track, or he stumbled in any way, or hesitated in his confusion at first seeing the train, he might not have had time to escape the accident. At least the jury could so infer. Can this court, as a matter of law, say that the presumption of due care which the instinct of self-preservation raises, is overcome by this evidence? In North Dakota, as we before stated, the burden of proving contributory negligence is upon the defendant, and not upon the plaintiff, and as we have before suggested, in nearly all of the cases cited by counsel, not only are the physical facts different, but there were eyewitnesses to the occurrences. In the case of Klotz v. Winona & St. P. R. Co. 68 Minn. 341, 71 N. W. 257, 3 Am. Neg. Rep. 201, we find the following language: "It cannot be said that in all cases, as a matter of law, it is the duty of the traveler to stop and look and listen for the approaching train. The case at bar, we think, is one where the surroundings were of such a character that made the question one of fact rather than one of law. There was a rumbling noise of the city mill near by; the moving of the engine eastward from where plaintiff was traveling, with its noise and blowing of its whistle, which might have operated to throw the plaintiff off his guard. By reason of so much noise from different sources, and especially from the engine which he could see moving away from him, he might have been deceived and misled. This rule as to noise has been applied where there was the sound of falling water at a crossing; Richardson v. New York C. R. Co. 45 N. Y. 847. Also where the noise was caused by a wagon and by a steam sawmill and by another train. Leonard v. New York C. & H. R. R. Co. 10 Jones & S. 225. See also Hendrickson v. Great Northern R. Co. 49 Minn. 245, 16 L.R.A. 261, 32 Am. St. Rep. 540, 41 N. W. 1044. Nor can it be said that the deceased was intentionally guilty of negligence or recklessness in his conduct. The moment he discovered the tender near him he made an effort to get out of its way, but was impeded by

the wheelbarrow, and the rope around his neck and attached to it, whereby he was jerked down by the tender and injured. The love of life is also too strong to permit us to indulge in any presumption that he acted recklessly, or that he did not do what a prudent man ordinarily would do to save his life. The railroad tracks were nearly parallel, and not far apart; the engine passing over them only about three times a day, and he may have been led to believe that the engine was continuing its eastward course away from him. The position of the ringing bell as the engine approached the crossing may have tended to force very much of its sound away from him. All of these matters, in connection with the omission of the defendant to have a footboard or other contrivance on the engine or tender to carry a lookout, the rate of speed of the engine, and its moving backward, all tend to rebut the charge of contributory negligence on the part of the deceased. A traveler approaching a railroad crossing has a right to presume that in handling its cars the railroad company will act with proper care, and that the signals of approach will be seasonably given. . . . It is the settled law of this state that contributory negligence is a matter of defense, and the plaintiff in making out his case need not prove the absence of it. And where there is any controversy as to the fact, and different conclusions might be drawn by fair-minded men, the question of contributory negligence is one for the jury, acting under proper instructions from the court." It is to be remembered that in the case at bar, though the witness Wordeman was questioned as to whether any men were placed on the footboard of the engine, his testimony was unsatisfactory and indefinite. There were men there at times, but at what times and when crossing the crossing, was not testified to. It is quite clear at any rate that if they had been on the footboard of an approaching engine when deceased was struck at the crossing, that they would have seen him.

The testimony of the witness Wordeman, the engineer on the freight engine, is as follows:

This switch engine has footboards. Two of them. One in front and one in the rear.

Q. Did you see any of the switch crew standing on the footboard as you went across this crossing that night?

A. I forget if there was anybody.

Q. I asked you if at any time you saw anybody standing on the footboard?

A. Yes.

Q. When, that night, in point of time did you see anybody standing there?

A. At all hours.

Q. Then you saw somebody standing on that footboard at 10 o'clock and right along every minute?

A. No, it is their business.

Q. I don't ask you about their business. I want to know if you saw this switch crew standing on that footboard as you went west that night.

A. At certain times I did.

The supreme court of Michigan, in the case of Cooper v. Lake Shore & M. S. R. Co. 66 Mich. 261, 11 Am. St. Rep. 482, 33 N. W. 306, held that it was gross negligence to back a train without a brakeman at the rear and as a lookout, across the main thoroughfare of a village where there is no flagman at the crossing, even at a rate but little faster than a person walks. It is not necessarily a sufficient exercise of care on the part of a railway company whose tracks cross a highway at a grade, to sound the whistle and ring the bell of its engines; but such company is bound to so manage its trains, and to give such other warnings of their approach, or take such other reasonable precautions as not to cause unnecessary risk to persons on or about the crossing. Chicago & N. W. R. Co. v. Netolicky, 14 C. C. A. 615, 32 U. S. App. 168, 406, 67 Fed. 665; Thompson v. New York C. & H. R. R. Co. 110 N. Y. 636, 17 N. E. 690.

It is, as we have before said, to be remembered that in North Dakota contributory negligence is a matter of defense, and freedom from the same is not necessary to be alleged in the complaint or proved by the plaintiff. This fact is well worth remembering, and it distinguishes many of the cases. The case of Grant v. Philadelphia, B. & W. R. Co. 215 Pa. 265, 64 Atl. 463, which is cited in § 37 of Moore on Facts, as tending to support the proposition that the jury cannot guess as to contributory negligence, and that where it was equally

probable that the deceased adopted a course of travel which was consistent with negligence as with due care, the court would not infer the former,—was a case in which the burden of proving and alleging freedom from negligence was upon the plaintiff. The author of the work, in fact, recognizes this fact, and in his note he says: "Evidently, if the burden of contributory negligence had rested upon the defendant, the latter would have failed for the same reason." We cannot, under the authorities, assume or entertain the hypothesis that the deceased crawled beneath the cars. There is no evidence of this fact. It is merely a hypothesis and guess of counsel, which is supported by no evidence and no presumptions. It is opposed to the presumption of a natural regard for one's self-preservation.

We hardly see, in the light of the decisions and of the record, how this court merits the charge made by the appellant in his petition for a rehearing, that it has distorted the evidence, established erroneous rules of law, and destroyed the precedents of the past. We have not even established a new rule in North Dakota. The rule in this state was thoroughly explained, if not laid down, by ex-Chief Justice Young in the case of Pyke v. Jamestown, 15 N. D. 157, 107 N. W. 359, when he said: "The question of negligence, whether it be of a defendant or the alleged contributory negligence of a plaintiff, is primarily and generally a question of fact for the jury. The question becomes one of law, authorizing its withdrawal from the jury only when but one conclusion can be drawn from the undisputed facts. 'If the undisputed facts are of such a character that reasonable men might draw different conclusions or deductions therefrom, then the question of negligence must be submitted to the jury.' " This doctrine has been recently affirmed by this court. See Kunkel v. Minneapolis, St. P. & S. Ste. M. R. Co. 18 N. D. 367, 121 N. W. 830. It is abundantly borne out by the decisions of the American states.

See also: Allen v. Pennsylvania R. Co. 9 Sadler (Pa.) 382, 12 Atl. 493; Illinois C. R. Co. v. Norwicki, 148 Ill. 29, 35 N. E. 358; Richmond & D. R. Co. v. Powers, 149 U. S. 43, 37 L. ed. 642, 13 Sup. Ct. Rep. 748; Dalton v. Chicago, R. I. & P. R. Co. 104 Iowa, 26, 73 N. W. 349; Galvin v. New York, 112 N. Y. 223, 19 N. E. 675; Hemingway v. Illinois C. R. Co. 52 C. C. A. 477, 114 Fed. 843; Whaley v. Vidal, 27 S. D. 627, 132 N. W. 242; Texas & P. R. Co. v.

Gentry, 163 U. S. 353, 41 L. ed. 186, 16 Sup. Ct. Rep. 1104; Frederickson v. Iowa C. R. Co. — Iowa, —, 135 N. W. 12; Soeder v. St. Louis, I. M. & S. R. Co. 100 Mo. 673, 18 Am. St. Rep. 724, 13 S. W. 714.

We are still of the opinion that there was sufficient evidence of financial interest to sustain the verdict of the jury, and that no error was committed in the admission of testimony. See 13 Cyc. 376, and cases cited; Sieber v. Great Northern R. Co. 76 Minn. 269, 79 N. W. 95. We, therefore, see no reason for reversing our former holding or for granting a rehearing. We have, however, after the filing of the petition, and influenced thereby, modified some of the statements made in the original opinion.

The petition for a rehearing is denied.